**CACTUS PIPE & SUPPLY CO., INC.,**
**Plaintiff-Appellant, Cross-Appellee,**

**v.**

**M/V MONTMARTRE, her engines, tackle, etc., et al., Defendants-Appellees,**

**ORIENT LEASING CO., LTD., Cross Plaintiff-Appellee,**

**v.**

**CORINTH PIPEWORKS, S.A., Cross Defendant-Appellee, Cross-Appellant.**

**No. 83–2478.**

United States Court of Appeals,
Fifth Circuit.

April 5, 1985.

Patrick E. Higginbotham, Circuit Judge, filed dissenting opinion.

Fulbright & Jaworski, R. Scott Hogarty, Hirsch, Westheimer, Block & Wilk, Joe C. Holzer, Houston, Tex., for plaintiff-appellant, cross-appellee.

Eikel & Davey, J.E. Davey, Robert Eikel, Houston, Tex., for defendant-appellee M/V Montmartre & cross plaintiff-appellee Orient Leasing Co.

Baker & Botts, William C. Bullard, Houston, Tex., for Canadian Forest, Seanav Intl.

G. Byron Sims, Houston, Tex., for Empire-United Stevedoring Corp.

Joseph Newton, Houston, Tex., for cross defendant-appellee, cross-appellant Corinth Pipeworks, S.A.

Before BROWN, TATE, and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal arises from claims for damage to a cargo of steel tubing shipped aboard the M/V MONTMARTRE in July, 1979. Because we find that *in rem* jurisdiction was established in one case of this consolidated action, we reverse. We also reverse and remand for a determination of whether the vessel was liable *in rem*. We affirm the trial court's finding that appellee, vessel owner, was not liable as the carrier of cargo because there was no evidence that the vessel owner authorized issuance of the bills of lading either by actual or apparent authority.

### How It All Began

Appellant, Cactus Pipe & Supply Co., Inc. (Cactus), contracted with Corinth Pipeworks, S.A. (Corinth) to purchase steel tubing. Under this agreement, the trial court found that Corinth was to arrange for shipment from Corinth, Greece to Houston, Texas. The cargo was shipped aboard the M/V MONTMARTRE owned by appellee Orient Leasing Co., Ltd. (Orient).

Before the carriage of cargo in issue, Orient bareboat chartered the MONTMARTRE to Eternity Navigation Co., S.A. (Eternity), in September, 1976. Eternity, as bareboat charter owner, time chartered the vessel to Iino Kaiun Kaisha, Ltd. (Iino). Iino in turn time chartered the MONTMARTRE to Canadian Forest Navigation Co., Ltd. (Canadian) in June, 1979. In July,

1979, Canadian voyage chartered the MONTMARTRE to Seanav International Co. (Seanav). Seanav in turn voyage chartered the vessel to Corinth.

Nine bills of lading covering the cargo were issued on July 14, 1979, signed by Delpa Shipping and Transportation Co., Ltd. (Delpa) "For The Master."[1] The vessel arrived in Houston in August, 1979, and surveyors observed damage in the hold before unloading. In addition to damage, appellant Cactus contends that portions of the cargo were never delivered.

Cactus, consignee of the cargo of steel tubing, instituted two causes of action seeking recovery of its damages. The First action (District Court No. H–80–1721) was brought in Cactus' name by its subrogated underwriter against the MONTMARTRE, Orient and Corinth. The Second action (District Court No. H–80–1769) was instituted by Cactus seeking recovery of the uninsured portion of its loss (approximately $10,000) against the vessel and against Orient, the vessel owner. The MONTMARTRE was never arrested. However, a claim of owner[2] was filed by Orient in both actions. Subsequently the two cases were consolidated pending trial.

On July 6, 1983, the district court, after a bench trial, entered its opinion finding that the cargo was damaged and short upon delivery in Houston, Texas. It also found that Corinth, the voyage charterer and shipper, was liable as a carrier of the cargo and that Orient, the vessel owner, was not liable because it was not the COGSA[3] carrier. The trial court found that the MONTMARTRE, although the carrying vessel, was not liable to Cactus because it was not liable for the acts or omissions of the charterer/shipper, Corinth. The district court entered judgment in favor of Cactus and against Corinth for $28,673.51 plus interest. On August 11, 1983, the trial court issued amended conclusions of law determining that *in rem* jurisdiction over the vessel did not exist because the vessel was never arrested nor had any bond or letter of undertaking been filed in the court by the owner of the vessel. The court held that the claims of owner filed by the vessel owner, Orient, manifested only the vessel owner's interest in the vessel and did not establish *in rem* jurisdiction. The district court also determined that, although a voyage charterer such as Corinth may be liable as a carrier, the evidence was insufficient to hold Corinth liable as a carrier under the

1. Delpa was an agent for Corinth at the loading Port of Corinth, Greece under Corinth's charter party with Seanav. The Master of the MONTMARTRE sent Delpa the following letter on July 13, 1979:

> I hereby authorize you to sign, on my behalf, bills of lading as per the Mate's Receipts without any remarks, as per relative C/P.

The trial court determined that technically, the bills of lading were not issued by Orient, Corinth, or their agents, but rather by the agent of the time charterer, Iino. Iino was not made a party to this suit. However, for reasons stated, we do not need to determine the charterer on whose behalf the bills of lading were issued.

2. (i) Filed in the First suit (District Court No. H–80–1721) on September 16, 1981:

> CLAIM OF OWNER TO THE M/V
> MONTMARTRE
> NOW APPEARS Orient Leasing Co., Ltd., for the interest of itself as owner of the M/V MONTMARTRE, her engines, etc., before this Honorable Court, and makes claim to the said vessel as the same is proceeded against at the instance of Cactus Pipe & Supply Co., Inc.,

and the said claimant avers that it was at the time of the filing of the complaint here, and still is, the true and bona fide owner of the M/V MONTMARTRE, her engines, etc.; wherefore, it prays to defend accordingly.

(ii) Filed in the Second suit (District Court No. H–80–1769) on September 16, 1981:

> ORIENT LEASING CO., LTD., CLAIM OF OWNER TO THE M/V MONTMARTRE
> NOW APPEARS Orient Leasing Co., Ltd., for the interest of itself as owner of the M/V MONTMARTRE, her engines, etc., before this Honorable Court, and, *without waiving its defense that it is not subject to the jurisdiction* of this Honorable Court, makes claim to the said vessel as the same is proceeded against at the instance of Cactus Pipe & Supply Co., Inc., and the said claimant avers that it was at the time of the filing of the complaint here, and still is, the true and bona fide owner of the M/V MONTMARTRE, her engines, etc.; wherefore, it prays to defend accordingly.

(emphasis supplied)

3. Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–15.

facts of this case.[4] Accordingly, Cactus was awarded nothing.

### The MONTMARTRE—In Rem Jurisdiction

■ Cactus disputes the district court's conclusion that there was no *in rem* jurisdiction established over the MONTMARTRE. Specifically, Cactus urges that the claims of owner[5] filed by Orient constituted an appearance on the part of the vessel thereby establishing *in rem* jurisdiction.

■ Generally, the power of the court to exercise jurisdiction over a vessel depends upon the arrest of the vessel within the court's territorial jurisdiction. *Reed v. The YAKA*, 307 F.2d 203, 204, 1962 A.M.C. 1226, 1228 (3d Cir.1962), *rev'd on other grounds*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373 (1963); *see also* Rule C, Supplemental Rules for Admiralty and Maritime Claims. A claimant, however, can waive the necessity of *in rem* seizure and consent to jurisdiction so far as its interest in the vessel is concerned. *The YAKA*, 307 F.2d at 204, 1962 A.M.C. at 1228. Thus in *Continental Grain Co. v. Federal Barge Lines, Inc.*, 268 F.2d 240, 1959 A.M.C. 2158 (5th Cir.1959), *aff'd sub nom. Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540, 1961 A.M.C. 1 (1960), we dealt with the issue of whether an *in rem* proceeding upon application of a willing claimant could be transferred under 28 U.S.C. 1404(a) to a district in which the *res* was not located. However, we initially determined that the issuance of a letter of undertaking on behalf of the vessel and a Non-Waiver of Rights Clause in the letter

perfected the *in rem* jurisdiction of the court. On the filing of the action *in rem* and *in personam* for damage to a cargo of soybeans, the barge FBL–585 was not seized. We pointed out that in accordance with the practice in major seaports, a letter of undertaking was given by the vessel owner providing that in consideration of the barge not being seized and released on bond, the vessel owner would "file claim to Barge FBL–585, ... and that, vessel lost or not lost would pay any final decree which may be rendered against said vessel in said proceedings." 268 F.2d at 243, 1959 A.M.C. at 2160. We determined that the letter of undertaking, and particularly the Non-Waiver of Rights Clause,[6] required that "we treat it as though, upon the libel being filed, the vessel had actually been seized, a Claim filed, a stipulation to abide decree with sureties executed and filed by Claimant, and the vessel formally released." *Id.* Essentially, the underlying rationale for all of this was the necessity of avoiding "needless costs, time, and inconvenience to litigants, counsel, ships, Clerks, Marshals, Keepers and court personnel...." *Id.*[7] In *Associated Metals & Minerals Corp. v. S.S. PORTORIA*, 484 F.2d 460, 1973 A.M.C. 2095 (5th Cir.1973), no *in rem* process was issued, the vessel was not arrested, and the owner did not waive attachment of the vessel. We thus determined on those grounds that the district court erred in entering judgment against the vessel *in rem*.

■ In other contexts, a party can waive an objection to *in personam* jurisdiction. *See* F.R.Civ.P. 12. Rule 12(h)(1) provides

---

4. Cactus did not raise any issues of liability against the shipper/charterer Corinth on appeal.

5. A claim of owner is a verified document filed by the claimant stating its possessory interest in the vessel, demanding restitution and the right to defend the vessel. *See supra* note 2.

6. In *Continental Grain* the undertaking expressly stated that "the rights of the libelant and claimant-respondent in this proceeding shall be, and for all purposes shall be taken to be, precisely the same as they would have been had the

vessel, in fact, been taken into custody by the United States Marshall under said *in rem* process, and released by the filing of claim and release bond." 268 F.2d at 243 n. 3, 1959 A.M.C. at 2161.

7. The Supreme Court affirmed our disposition of the case, holding that it was proper for the district court in which the cargo owner's *in personam* and *in rem* actions were brought to transfer it pursuant to 28 U.S.C. § 1404(a) to the district court in which the vessel owner brought an action against cargo for negligence.

that the defense of lack of jurisdiction over the person is waived (i) if omitted from a motion under 12(g), or (ii) if it is neither made by motion under Rule 12 nor included in a responsive pleading or an amendment. *See Golden v. Cox Furniture Mfg. Co.,* 683 F.2d 115 (5th Cir.1982) (objection to personal jurisdiction waived when answer and amended answer filed without raising *in personam* jurisdiction objection); *Jackson v. Hayakawa,* 682 F.2d 1344, 1347 (9th Cir.1982) (jurisdiction attaches if a defendant makes a voluntary general appearance, as by filing an answer through an attorney); *Familia De Boom v. Arosa Mercantil, S.A.,* 629 F.2d 1134, 1140, 1981 A.M.C. 2937, 2944 (5th Cir.1980), *cert. denied,* 451 U.S. 1008, 101 S.Ct. 2345, 68 L.Ed.2d 861, 1981 A.M.C. 2100 (1981) (service of process and personal jurisdiction may be waived by a party); *United States v. Fishing Vessel MARY ANN,* 466 F.2d 63, 1972 A.M.C. 2652 (5th Cir.1972), *cert. denied sub nom. Walter v. United States,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973) (action to foreclose preferred ship mortgage—two defendants not served with process but answered asserting defenses on the merits).

Generally, an appearance in an action involves some presentation or submission to the court. *Port-Wide Container Co. v. Interstate Maintenance Corp.,* 440 F.2d 1195, 1196 (3d Cir.1971) (no appearance found). An appearance may result from the filing of an answer without raising jurisdictional defects. An appearance may also arise by implication "from a defendant's seeking, taking, or agreeing to some step or proceeding in the cause beneficial to himself or detrimental to plaintiff other than one contesting only the jurisdiction or by reason of some act or proceedings recognizing the case as in court." 6 C.J.S. *Appearances* § 18 at 22 (1975); *see also Grammenos v. Lemos,* 457 F.2d 1067, 1070 (2d Cir.1972) (if a party enters a case and fails to object to jurisdiction, and requests the court to do some affirmative act on its behalf in some substantive way, the party

will be held to have waived further objection).

 In this case we must decide whether the filing of a claim of owner in a proceeding characterized expressly in the complaint as both *in rem* and *in personam* with the traditional prayer for issuance of process *in rem* against the vessel is sufficient to obtain *in rem* jurisdiction over the vessel. We hold that it does.

Some procedural background in this case is necessary to our analysis of *in rem* jurisdiction. In the First suit (District Court No. H–80–1721), the subrogated underwriter brought suit in the name of its assured, Cactus, against the vessel owner, vessel and charterer, Corinth. Cactus' prayer requested:

> that process in due form of law according to the practice of this Honorable Court in causes of admiralty and maritime jurisdiction may issue against the M/V MONTMARTRE, citing all persons having any interest in said vessel to appear and answer on oath all and singular the matters aforesaid.... That the said M/V MONTMARTRE may be condemned and sold to pay the damages, with interest, costs and disbursements.

There was also a prayer for process against Orient and Corinth, and in fact, process was issued only as to Orient and Corinth. Orient answered for itself[8] and there was no mention of an *in rem* jurisdiction challenge. Orient also filed several third party complaints and pursued discovery against all parties. On September 16, 1981, Orient filed its Claim of Owner to the MONTMARTRE[9] and a motion for consolidation of the two pending cases.

In Second suit (District Court No. H–80–1769) the complaint was filed by Cactus against the MONTMARTRE and Orient for $10,000 on August 6, 1980 (recovery of the uninsured portion of its loss). Cactus' complaint prayed:

> that process in due form of law according to the practices of this Honorable

---

**8.** Orient's answer began: "Now comes Orient Leasing Co., one of the defendants herein...."

**9.** *See supra* note 2, part (i).

Court in causes of admiralty and maritime jurisdiction may issue against M/V MONTMARTRE, her engines, boilers, tackle, etc., and that all persons having any right, title and interest therein be cited to appear and answer on oath all and singular the matters aforesaid, and that the said M/V MONTMARTRE may be condemned and sold to pay the damages of the aforesaid, with interest and cost.

No *in rem* process was issued by the Clerk. The only process issued was against Orient.

The Second case proceeded as a separate suit in a different district court. In November, 1980, an order of dismissal was entered by the trial judge for failure to prosecute. The judge later granted reinstatement of the case. Cactus moved for entry of a default judgment which the trial court later granted. The default judgment recites that both the vessel and vessel owner were defendants, were properly served, and they failed to appear and answer. Two months later on August 12, 1981, Orient and the MONTMARTRE filed in the Second suit a motion to vacate and set aside the default judgment. Apparently the complaint was sent to Orient in Japan and there was some confusion with the First suit already on file. It is important to point out that in this motion, an objection to *in rem* jurisdiction was raised on the ground that the vessel was not arrested. The trial judge set aside the default judgment on September 8, 1981. On September 16, 1981, Orient filed its answer—only as to

itself—and expressly asserted an objection to *in rem* jurisdiction. Orient also filed interrogatories and a third party complaint each raising the jurisdiction objection. On the same day, Orient filed its claim of owner [10] specifically preserving its objection to the jurisdiction of the court.

On September 22, 1981, both trial judges in the two pending suits entered an order consolidating the cases "for all purposes." After the consolidation, on October 6, 1981, Orient as defendant and claimant and the MONTMARTRE as defendant [11] moved for summary judgment on the merits and on the ground that there was no *in rem* jurisdiction. Thereafter, the trial judge entered his memorandum and order denying the motion for summary judgment. The trial court did state, however, that there was a colorable challenge to the *in rem* jurisdiction of the court. Since neither party had adequately briefed this issue, the defendant was permitted to resubmit a motion to dismiss for lack of *in rem* jurisdiction.[12] The consolidated cases were tried before the judge, and he entered his findings in July, 1983, and amended conclusions of law in August, 1983. Initially the trial court determined that Corinth, the voyage charterer, was liable as the carrier but Orient and the MONTMARTRE were exonerated. The trial court issued amended conclusions of law holding that there was no *in rem* jurisdiction over the vessel and the evidence was insufficient to hold Corinth responsible for the damage to the cargo.

Rule C(6),[13] Supplemental Rules for Admiralty and Maritime Claims clearly de-

---

10. *See supra* note 2, part (ii).

11. The motion for summary judgment began: "the M/V MONTMARTRE and Orient Leasing Co., Ltd., two of the defendants in the above-entitled and numbered causes...."

12. The record contains no memoranda or motion responding to this request.

13. Rule C, Supplemental Rules for Admiralty and Maritime Claims, provides in part:
(6) Claim and Answer; Interrogatories. The claimant of property that is the subject of an action in rem shall file his claim within 10 days after process has been executed, or within such additional time as may be allowed by

the court, and shall serve his answer within 20 days after the filing of the claim. The claim shall be verified on oath or solemn affirmation, and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action. If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that he is duly authorized to make the claim. At the time of answering the claimant shall also serve answers to any interrogatories served with the complaint. In actions in rem interrogatories may be so served without leave of court.

fines the purpose of filing a claim of owner. The claimant must state his interest in the vessel by *virtue* of which the claimant demands *restitution* of the vessel and *the right to defend* it. The vessel owner's right to file an answer is predicated upon the filing of the claim of owner pursuant to Supplemental Rule C(6). "The right of answering in denial or avoidance of the libel, and all of it, in a suit *in rem* in the admiralty, depends upon the right to claim.... [T]he claimant in admiralty may defend *in rem*, because he demands the redelivery to him of the arrested vessel." *The CARTONA*, 297 Fed. 827, 828, 1924 A.M.C. 771, 772 (2d Cir.1924). We thus agree with the trial court that the claim of owner manifests the owner's interest in the vessel. We must disagree with the trial court's determination that an unconditional claim does not give rise to *in rem* jurisdiction. When the vessel owner lays claim to the vessel he has appeared on its behalf.

In *The ROSALIE M*, 12 F.2d 970, 1927 A.M.C. 999 (5th Cir.1926) a warrant of seizure was issued in a forfeiture proceeding and the vessel was seized. Appellant filed an answer and *claimed* the vessel as agent for the owner. On appeal, the appellant contended that (i) the seizure of the vessel was unlawful because it was made beyond the territorial jurisdiction of the United States since the Volstead Act (a cargo of liquor was seized) had no effect beyond three miles from the shore and (ii) the Coast Guard had no authority outside the twelve mile limit under the Tariff Act of 1922.

We determined that, conceding that the Volstead Act was not in operation at the point where the vessel was initially seized, the vessel was nevertheless subject to seizure because she was engaged in an unlawful enterprise. We further conceded, without deciding, that the Coast Guard cutter was not authorized to operate outside the twelve mile limit. We reasoned that it did not necessarily follow that the judgment was illegal and that the objection to the authority of the Coast Guard to make the seizure was purely technical and without merit. We stated that "after a ship is brought into the custody of the marshal through proper admiralty process, any irregularity in the initial seizure is immaterial, and is *waived* by filing *a claim* or answer." 12 F.2d at 971, 1927 A.M.C. at 1002 (emphasis supplied). The Supreme Court similarly ruled in *The MERINO*, 22 U.S. (9 Wheat.) 391, 400, 6 L.Ed. 118, 120 (1824), in which the vessel owner questioned irregularities in the *in rem* process. The Court reasoned that all objections to the irregularities were waived by the appearance of the parties interested in the property seized and filing their claims to the *res*. *Id.*

█ In this case there were two claims of owner filed. In the First suit (District Court No. H–80–1721 suit brought by subrogated underwriter) the claim of owner stated: "Now appears Orient ... and makes claim to the [MONTMARTRE] ... and said claimant avers that it was ... owner ... wherefore it prays to defend accordingly." In the Second suit (District Court No. H–80–1769) the claim of owner was the same as that filed in the other case except it stated "... without waiving its defense that it is not subject to the jurisdiction of this Honorable Court." (See note 2, parts (i) and (ii)).

We are persuaded that the claim of owner filed in the First suit (District Court No. H–80–1721) perfected the *in rem* jurisdiction of the district court. By the filing of this claim without any jurisdictional objection—and without any prior objection in the pleadings—the MONTMARTRE has appeared. The Claim of Owner does more than state the vessel owner's interest. The Claim specifically demands the return of the vessel—a substantive request that is detrimental to the plaintiff. The filing of the claim of owner also bears many of the earmarks of the filing of a claim of owner with a letter of undertaking in *Continental Grain*, 268 F.2d at 243, 1959 A.M.C. at 2160, and was effective under the circumstances of this case.

In the Second suit (District Court No. H–80–1769), however, the vessel owner ad-

equately preserved its challenge to *in rem* jurisdiction. From Orient's and the MONTMARTRE's initial motion to vacate the default judgment through the consolidation of the cases, the objection to *in rem* jurisdiction was adequately raised and preserved. *See Aetna Business Credit, Inc. v. Universal Decor & Interior Design, Inc.*, 635 F.2d 434 (5th Cir.1981) (objections to adequacy of service of process preserved).

We hold therefore that the trial court incorrectly determined that there was no *in rem* jurisdiction over the vessel in the consolidated action insofar as that action relates to the allegations in the First suit (District Court No. H–80–1721). However, the action asserted by Cactus against the vessel and vessel owner in the Second suit (District Court No. H–80–1769) was correctly dismissed for lack of *in rem* jurisdiction.

### Orient—Vessel Owner

Cactus asserts that the trial court erroneously refused to find *in personam* liability against Orient, the vessel owner. It does so on the basis that the bills of lading were issued with the apparent authority of the vessel owner and that Cactus relied on such apparent authority. The bills of lading were signed by Delpa "For The Master"—who technically was not the employee of Orient, the vessel owner. The trial court found that none of the parties to this case issued the bills of lading.[14]

Cactus asserts that the apparent authority claim is based largely on the failure of the bills of lading to identify the carrier or the party who employed the Master or on whose behalf the agent was acting when the bills of lading were signed. In support of this claim it also argues that the bills of lading were on anonymous standard forms, and that the printed text of the bills of lading refer to "owner" and "shipowner." Cactus further argues that it and the holder of the bills of lading could reasonably believe that they were issued with the authority of the vessel owner. We conclude that this evidence alone did not justify Cactus in believing that the bills of lading were

issued by an agent authorized to do so on behalf of Orient, the vessel owner.

Maritime law embraces the principles of agency. *West India Industries, Inc. v. Vance & Sons AMC–Jeep*, 671 F.2d 1384 (5th Cir.1982). We initially point out that Cactus introduced no evidence of any actual authority of an agent to issue the bills of lading on behalf of the vessel owner. *See Associated Metals & Minerals Corp. v. SS PORTORIA*, 484 F.2d 460, 462, 1973 A.M.C. 2095, 2096–97 (5th Cir.1973). Nor was apparent authority established. Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him. Restatement (Second) Of Agency § 27. Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling.

In this case there are no facts which could reasonably lead Cactus or the holder of the bills of lading to believe that they were issued on the vessel owner's behalf. Our analysis is based upon the premise that for apparent authority to exist there must be some manifestation (whether an act or an omission) of the principal that causes the third person to believe that the agent is authorized to act for him or the principal should realize that his conduct is likely to create such a belief. *See* Restatement (Second) Of Agency § 27 comment a. Cactus has not pointed to any facts sufficiently supporting some manifestation by the vessel owner to Cactus justifying reliance. Here, the bills of lading were issued by Delpa, the agent of Corinth or Iino (*see supra* note 1). Furthermore, there was no evidence that the vessel owner authorized Delpa to issue bills of lading or that the vessel owner approved the form or contents. An agent cannot confer authority upon himself. *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*,

14. *See supra* note 1.

588 F.2d 1, 10, 1978 A.M.C. 2634, 2647 (2d Cir.1978). The court in *Karavos* quoted Judge Levet in *Dr. Beck & Co., GmbH. v. General Electric Co.*, 210 F.Supp. 86, 90 (S.D.N.Y.1962), *aff'd*, 317 F.2d 538 (2d Cir. 1963) by an analysis which applies with equal force in this case:

> While agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority (*quoting* Mechem, Agency 61 (4th ed. 1952)), 588 F.2d at 10, 1978 A.M.C. at 2647.

We thus can find no sufficient basis to conclude that Cactus or the holder of the bills of lading reasonably relied on some manifestation by Orient, the vessel owner, to justify a belief that the bills of lading were issued on Orient's behalf.

■■■ There was no basis, therefore for holding Orient liable *in personam*.

**15.** *But cf. Baker v. Raymond International, Inc.*, 656 F.2d 173, 184, 1982 A.M.C. 2752, 2767 (5th Cir.1981), *cert. denied*, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861, 1982. A.M.C. 2107 (1982). In *Baker*, Judge Rubin discussed the fiction of the vessel's personality. " '[T]he fiction of ship's personality,' according to Professors Gilmore and Black, 'has never been much more than a literary theme,' now fallen into disrepute." *Id.* Fiction or not, the notion still has vitality in those situations in which settled principles of maritime law recognizes the difference—indeed sometimes the absence—of *in personam* liability. *See e.g. Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); *Associated Metals & Minerals Corp. v. S.S. PORTORIA*, 484 F.2d 460, 1973 A.M.C. 2095 (5th Cir.1973).

**16.** In *Canadian Aviator*, the Supreme Court determined:

> The use of the phrase 'caused by a public vessel' constitutes an adoption by Congress of the customary legal terminology of the admiralty law which refers to the vessel as causing the harm although the actual cause is the negligence of the personnel in the operation of the ship. Such personification of the vessel, treating it as a juristic person whose acts and omissions, although brought about by her personnel, are personal acts of the ship for which, as a juristic person, she is legally responsible, has long been recognized by this Court. (citations omitted)

*Canadian Aviator*, 324 U.S. at 224, 65 S.Ct. at 644, 89 L.Ed. at 908, 1945 A.M.C. at 272.

## The MONTMARTRE

■■ Cactus nevertheless contends that the MONTMARTRE is itself liable *in rem* for damage to the cargo of steel tubing involved in the First suit (District Court No. 80–1721). A proceeding *in rem* in the admiralty is one against the vessel as the offending thing.[15] The vessel may be held liable even in the absence of the liability, *in personam*, of the vessel owner. *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 224, 65 S.Ct. 639, 644, 89 L.Ed. 901, 908, 1945 A.M.C. 265, 272 (1945);[16] *Grigsby v. Coastal Marine Service*, 412 F.2d 1011, 1030–31, 1969 A.M.C. 1513, 1539 (5th Cir.1969), *cert. dismissed*, 396 U.S. 1033, 90 S.Ct. 612, 613, 24 L.Ed.2d 531 (1970).[17]

In effect the arrangement between Corinth and the vessel was akin to special or private carriage as to which COGSA would not attach unless bills of lading are issued.[18] COGSA, 46 U.S.C. § 1305. Al-

**17.** In *Grigsby*, this court reasoned:

> Obviously of course, the absence of possession and control may well insulate the shipowner from a liability in personam in the absence of conduct which somehow implicates the remote owner in the deficiency. But on principles of *in rem* liability, or concepts akin to it, there seems to be no more reason for the physical absence of an owner's representative universally to insulate the vessel from accountability for personal injuries occasioned by unseaworthiness that there is to absolve the vessel from *in rem* liability for, say, other types of maritime torts including collision, even though the vessel, on this hypothesis, is wholly in the control of a demise charterer and, worse being conned by a compulsory pilot.

*Grigsby*, 412 F.2d at 1030–31, 1969 A.M.C. at 1539.

**18.** COGSA, 46 U.S.C. § 1305 provides:

> A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under this chapter, provided such surrender or increase shall be embodied in the bill of lading issued to the shipper.
>
> The provisions of this chapter shall not be applicable to charter parties; but if bills of lading are issued in the case of a ship under a charter party, they shall comply with the terms of this chapter. Nothing in this chapter shall be held to prevent the insertion in a bill

though bills of lading were issued they were not issued either by the vessel owner, Orient, or by one acting with its authority. Therefore, as we have held above Orient has no liability *in personam*.[19]

Nonetheless bills of lading were issued and the vessel sailed with the goods on board. Under those circumstances, Black Letter Law translates Cleirac's historic aphorism "Le batel est obligé a la marchandise et la marchandise au batel"[20] into the settled maritime principle that sweeps away as immaterial any question of the authority of the issuer of the bills of lading to hold the ship liable *in rem* for loss or damage to the cargo carried.

When cargo has been stowed on board the vessel and bills of lading are issued, the bills of lading become binding contracts of the vessel *in rem* upon the sailing of the vessel with the cargo. The sailing of the vessel constitutes a ratification of the bills of lading. *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163, 173, 1963 A.M.C. 946, 956 (5th Cir. 1963); *see Cavcar Co. v. M/V SUZDAL*, 723 F.2d 1096, 1101, 1984 A.M.C. 609, 617 (3d Cir.1983); *Demsey & Assoc. v. The S.S. SEA STAR*, 461 F.2d 1009, 1015, 1972 A.M.C. 1440, 1447 (2d Cir.1972); *cf. Insurance Co. of North America v. The S/S AMERICAN ARGOSY*, 732 F.2d 299, 303, 1984 A.M.C. 1547, 1553 (2d Cir.1984); *see also,* H. Longley, *Common Carriage of Cargo*, § 3.05[1][b] at 26 (1967). This action gives rise to a maritime lien which is the basis of the *in rem* recovery. Even though the vessel is operating under charter parties, the lien against the vessel is not affected. *Demsey*, 461 F.2d at 1014, 1972

A.M.C. at 1446. Therefore, the sailing of the MONTMARTRE with the cargo of steel pipes aboard constituted a ratification of the bills of lading.

Initially the trial court determined that although a vessel may be liable *in rem* as the carrier, the MONTMARTRE was not liable for the loss since that loss arose from the act or omission of the shipper, Corinth. In its amended conclusions of law, the trial court withdrew its prior conclusion regarding the MONTMARTRE's liability and determined that there was no *in rem* jurisdiction over the vessel. Because today we determined that the vessel was properly before the court, *in rem*, and there is *in rem* liability for loss or damage to the cargo, we remand to the trial court for the determination of liability against the vessel *in rem* for losses within the First suit (District Court No. H–80–1721).

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

The majority has concluded that the filing of a Claim of Owner alone subjects a vessel to the *in rem* jurisdiction of the court. In my view, *in rem* jurisdiction over the vessel existed only if the owner intended to waive its arrest or if a waiver of arrest was the necessary legal consequence of the filing of a Claim of Owner. The owner did not intend to concede *in rem* jurisdiction, and nothing in the applicable rules of procedure contemplates the found waiver of arrest. There is, then, no legal basis for the implication of *in rem* jurisdiction, and I dissent.

---

of lading of any lawful provision regarding general average.

**19.** As not issued under and pursuant to a charter party, 42 U.S.C. § 1301 has no immediate application:

COGSA, § 1301 provides in part:
 (b) The term "contract of carriage" applies only to contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid

issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

**20.** G. Gilmore & C. Black, *The Law of Admiralty*, § 3–45 at 187 (2d ed. 1975) (quoting *Osaka Shosen Kaisha v. Pacific Export Lumber Co.*, 260 U.S. 490, 497, 43 S.Ct. 172, 173, 67 L.Ed. 364, 367, 1923 A.M.C. 55, 58 (1923).

## I

The record leaves no doubt but that the vessel owner did not intend to concede *in rem* jurisdiction. As pointed out by the majority, there were two suits consolidated before the same judge. Claims of Owner were filed in both suits. The claims of ownership were identical except that in the second suit, the Claim of Owner stated "... without waiving its defense that it is not subject to the jurisdiction of this honorable court." The owner has always contested the absence of *in rem* jurisdiction. Yet, the majority concludes that the omission of the "without waiving its defense" qualifying language gave the court *in rem* jurisdiction in the first case. Even if an intent to waive arrest could be inferred from this plain inadvertence, it ought not be; certainly the district court was not required to do so. An admiralty court has the "power" to "withdraw from the extremes to which the general appearance rule ha[s] been pushed and to find no waiver when there [is] no *intentional* abandonment of the jurisdictional objection." *Giannakouros v. Oriental Tanker Corp.*, 338 F.2d 649, 650 (4th Cir.1964), *cert. denied*, 380 U.S. 979, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965) (emphasis added). *See also Untersinger v. United States*, 172 F.2d 298, 301 (2d Cir.1949) (no waiver where objection to venue in admiralty action made in answer that also pleaded to merits).

## II

If waiver of arrest here cannot rest upon a conclusion that the owner intended to concede *in rem* jurisdiction, the majority's opinion then must rest upon a reading of the rules that the filing of a Claim of Owner necessarily subjects the vessel to *in rem* jurisdiction. I find nothing to support that reading.

It is true that the Supplemental Rules of Admiralty are only *supplemental*. Actions *in rem* are governed by the general Rules of Civil Procedure, "except to the extent that they are inconsistent with [the] Supplemental Rules." Fed.R.Civ.P. A, Supplemental Rules for Certain Admiralty and Maritime Claims. But it does not follow, as the majority urges, that a Claim of Owner, as a responsive pleading, is analogous to a Rule 12 motion or an answer in which jurisdictional objection must be made or be held waived. The civil rules explicitly provide for waiver. The admiralty rule has no such requirement.

Admiralty Rule C sets the procedural scheme for bringing and responding to an *in rem* claim. After outlining notice and arrest procedures, the Rule addresses the *necessary* initial response to such action. Rule C(6) provides in part:

(6) Claim and Answer; Interrogatories. The claimant of property that is the subject of an action in rem shall file his claim within 10 days after process has been executed, or within such additional time as may be allowed by the court, and shall serve his answer within 20 days after the filing of the claim. *The claim shall be verified on oath or solemn affirmation, and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action.* If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that he is duly authorized to make the claim.... (emphasis added).

The Claim may be filed by any person asserting either an ownership or a possessory interest in a vessel subject to *in rem* arrest or service of process. 7A J. MOORE, *Moore's Federal Practice* ¶ C.16 at 700.13. "The filing of a claim is a *prerequisite* to the right to file an answer and defending on the merits." *Id.* at 700.14 (emphasis added). *See also United States v. Fourteen (14) Handguns*, 524 F.Supp. 395, 397 (S.D.Tex.1981). The Advisory Committee Notes, while not addressing this issue, state that the purpose of Rule C(6) was to provide a uniform rule "so that any claimant or defendant can readily determine when he is required to file or serve a claim or answer," and to require "claimants to come forward and identify themselves at an early stage of the proceedings—*before they could fairly be required to answer*." (emphasis added). *See also Bank of New Orleans & Trust Co. v. Ma-*

*rine Credit Corp.*, 583 F.2d 1063, 1068 n. 7 (8th Cir.1978) (Rule C(6) "provides an appropriate method by which to assert ... claim"). Apparently, then, the Claim simply confers the standing necessary to answer a libel against a vessel. *See United States v. $4,255,625.39*, 528 F.Supp. 969, 971 (S.D.Fla.1981).

Rule C(6) requires all claimants to demand "restitution and the right to defend the action." A vessel owner, then, makes no substantive demand beyond that required by the Rules when he demands return of the vessel. Moreover, in the Claim held here to constitute an appearance, Orient made claim to the MONTMARTRE as its owner and asked only "to defend accordingly." Although the majority suggests otherwise, Orient did not specifically demand the vessel's return in its initial Claim.

A Claim of Owner lacks "many of the earmarks" of the inherently consensual letter of undertaking. Admiralty courts have traditionally waived strict adherence to the jurisdictional requirement of arrest, and allowed release of a vessel from custody upon the posting of a bond or a stipulation for value. Such a bond confers jurisdiction even in the absence of arrest. G. Gilmore & C. Black, *The Law of Admiralty*, § 9–89, at 796–801 (2d ed. 1975). In effect, the ship's owner *consents* to the court's *in rem* jurisdiction to avoid the attendant delays and economic costs associated with attachment. *See United States v. Marunaka Maru No. 88*, 559 F.Supp. 1365, 1368–69 (D.Alaska 1983). As the majority points out, admiralty courts have also recently permitted private letters of undertaking between the owner and claimant to take the place of bond or stipulation. *See G. Gilmore & C. Black, supra*, at 800–01. In *Continental Grain Co. v. Federal Barge Lines, Inc.*, 268 F.2d 240, 243 n. 3, 1959 A.M.C. 2158 (5th Cir.1959), *aff'd sub nom. Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960), for example, the undertaking expressly stated that the parties' rights would be treated as if the vessel had, in fact, been arrested. The court thus treated the letter "as though, upon the libel being

filed, the vessel had actually been seized, a Claim filed, a stipulation to abide decree with sureties executed and filed by Claimant, and the vessel formally released." *Id.* at 243. The bond, stipulation for value, and letter of undertaking, then, become jurisdictional substitutes for the vessel itself, the *res* upon which the court may act. *See Continental Grain Company*, 364 U.S. at 38, 80 S.Ct. at 1481 (Whittaker, J., dissenting) ("This Court has from an early day consistently held that a bond, given to prevent the arrest or procure the release of the vessel, is substituted for and stands as the vessel in the custody of the court"); *J.K. Welding Co., Inc. v. Gotham Marine Corp.*, 47 F.2d 332, 335 (S.D.N.Y.1931) ("The stipulation for value is a complete substitute for the res, and the stipulation for value *alone* is sufficient to give jurisdiction to a court because its legal effect is the same as the presence of the *res* in the court's custody....") (emphasis added). *See also Alyeska Pipeline Service Co. v. Vessel Bay Ridge*, 703 F.2d 381, 384 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3526, 82 L.Ed.2d 852 (1984); *American Bank of Wage Claims v. Registry of District Court of Guam*, 431 F.2d 1215, 1218 (9th Cir.1970). The Claim of Owner then, is an unlikely substitute for the arrested vessel, for it provides no affirmative "undertaking" from which an *in rem* judgment could be satisfied.

The majority relies upon *Reed v. YAKA*, 307 F.2d 203, 204, 1962 A.M.C. 1226, 1228 (3d Cir.1962), *rev'd on other grounds*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). There, the vessel was outside the court's territorial jurisdiction, was never arrested, and no bond or stipulation for value was ever filed. The owner answered on the merits, averring that "it voluntarily appeared as claimant to avoid attachment and delay of the vessel if it should subsequently be present" within the territory. *Id.* He failed to raise the lack of *in rem* jurisdiction until appeal. The court held the owner's "voluntary appearance" was equivalent to a letter of undertaking, waiving arrest and consenting to jurisdiction so far as "its interest in the ship." *Id.* at 205. Unlike Orient here, the owner in *Reed*

made a general appearance, answered on the merits, and never raised a jurisdictional objection until after trial and on appeal. *The ROSALIE M,* 12 F.2d 970, 1927 A.M.C. 999 (5th Cir.1926), dealt with waiver of irregularities in arrest *"[a]fter* a ship is brought into the custody of the marshal through proper admiralty process." *Id.* at 971 (emphasis added). *The MERINO,* 22 U.S. (9 Wheat.) 391, 401, 6 L.Ed. 118 (1824), dealt with irregularities in service of process, which the Supreme Court held had "nothing to do with the question of jurisdiction." The Court expressly stated that the property at issue was within the territorial jurisdiction of the district court. *Id.*

I find no basis to quarrel with the district court's ruling. I must dissent, respectfully.