Stavros E. FANOS, On Behalf of Himself and Those Similarly Situated Plaintiff,

v.

MAERSK LINE, LTD., Maersk Sealand, A.P. Moller Group, Maersk, Inc., Wilmington Trust, Expander Transport Corporation, Expediter Transport Corporation, Expresser Transport Corporation, Exporter Transport Corporation, and Extender Transport Corporation Defendants.

No. CIV.A.G–02–119.

United States District Court, S.D. Texas, Galveston Division.

Feb. 21, 2003.

Alton C Todd, Attorney at Law, Friendswood, Thomas M Stanley, Eastham Watson Dale & Forney, Houston, Joseph Durkin Ledgard, Eastham Watson et al, Sugar Land, for Stavros E Fanos, On Behalf Of Himself and Those Similarily Situated, plaintiff.

William A Worthington, Strasburger & Price, Houston, for Maersk Line, Ltd., Maersk Sealand, A.P. Moller Group, Maersk, Inc., Wilmington Trust, Expander Transport Corporation, Expediter Transport Corporation, Expresser Transport Corporation, Exporter Transport Corporation, Extender Transport Corporation, defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff Stavros E. Fanos ("Fanos" or "Plaintiff") brings this claim for seamen's wages and penalty wages under 46 U.S.C. § 10313 against Defendants Maersk Line, Ltd., Maersk Sealand, A.P. Moller Group, Maersk, Inc., Wilmington Trust, Expander Transport Corporation, Expediter Transport Corporation, Expresser Transport Corporation, Exporter Transport Corporation, and Extender Transport Corporation (collectively "Defendants"). On October 31, 2002, Plaintiff filed a Motion for Partial Summary Judgment and Defendants filed a Motion to Dismiss and a Motion for Summary Judgment. Each Party timely responded to the other's Motions. For the reasons articulated below, Defendants' Mo-

tion for Summary Judgment is hereby **GRANTED,** and Plaintiff's Motion for Partial Summary Judgment is respectfully **DENIED.** Because this Order Granting Defendants' Motion for Summary Judgment disposes of the entire case, Defendants' Motion to Dismiss is **NOT REACHED.**

However, before addressing the merits, the Court would be remiss if it did not thank the attorneys for both sides for the absolutely superb briefing submitted in this matter. *All* of the dispositive submissions have been concise, articulate, accurate, and remarkably persuasive. While this makes the Court's decision all the more difficult, it also renders that work a labor of love. The Court, always aware of its symbiotic relationship with the Bar, is deeply grateful for the privilege of working with lawyers of this caliber.

## I. Facts and Background

In 1982, Defendant Maersk Line, Ltd. ("Maersk Line") successfully bid on a contract to provide five Military Prepositioning Ships ("MPS") to the U.S. Navy Military Sealift Command ("MSC"), which uses the ships to provide strategic sealift and transportation services to the U.S. Armed Forces. After Maersk Line was awarded the contract, Wilmington Trust, the "owner trustee" of the five ships,[1] bareboat chartered each of the five ships to one of the "E Companies," Defendants Expediter Transport Corporation, Expresser Transport Corporation, Exporter Transport Corporation, and Extender Transport Corporation, companies created for the purpose of chartering the ships. Each E Company then time chartered its ship to the U.S. Navy MSC. Under a contract with the E Companies, Maersk Line operated the five vessels.[2]

In 1984, before the ships were placed in service, the E Companies and District 2, Marine Engineers Beneficial Association–Associated Maritime Officers, AFL–CIO (the "Union")[3] signed collective bargaining agreements ("CBAs") for the employment of Union officers aboard the MPS vessels. The CBAs[4] describe the officers' vacation entitlement, which is now the source of controversy between the Parties. Article II, section 6 of the CBAs states, "For all days of covered employment, Officers shall receive fifteen (15) days of paid vacation for each thirty (30) days of such employment." (The vacation entitlement has been increased several times, and officers are now entitled to nineteen (19) days of paid vacation for each thirty (30) days worked.) The CBAs require Union employers, such as Maersk Line or the E Companies, to join the various Union benefit plans, such as the Vacation Plan,[5] and to contribute to the plans based-in the case of the Vacation Plan-on the daily wages paid

---

**1.** The Parties dispute whether Wilmington Trust is the vessels' "owner" for purposes of the wage penalty statute.

**2.** The Parties disagree about which entity is the officers' employer-Maersk Line or the particular E Company.

**3.** The Union is now the American Maritime Officers Union.

**4.** In August of 1984, each E Company signed a CBA with the Union regarding the employment of deck and engine room officers. An-

other CBA was signed in February of 1985 regarding the employment of radio operators. The relevant sections of these CBAs are identical.

**5.** Article I, section 2, entitled "Benefits and Contributions," states, "It is agreed that the Company will become and remain a party to the [Union] Pension, Medical, Safety and Education and Vacation Plans .... The Company further agrees to sign the appropriate Agreement and Declaration of Trust for the aforementioned Plans and entities as necessary ...."

to the Union officers. The Plans are independent entities governed by trustees.[6]

In 1985, the Union and the E Companies signed a Memorandum of Understanding ("1985 MOU"), which, among other things, eliminated employers' duplicate benefits contributions, which occurred on "overlap days." An overlap day is a day when two officers are aboard a ship to perform one job. For example, if Officer A's duty ends at 4:00, and Officer B relieves him at that time, the employer would contribute to both officers' benefits plans, essentially contributing two days' worth of benefits for one day of work. Paragraphs II(A) and II(B) of the 1985 MOU eliminate the duplicate contributions:

> (A) There shall not be any duplication of contributions to the various [Union] Plans, Committees or Services. (B) When processing a vacation benefit application the [Union] Vacation Plan shall deduct one day of covered employment before calculating the benefit payable. Such deduction shall be for employment commencing on or after March 1, 1985 and per non-continuous pay periods.[7]

To collect vacation pay, Union members must submit their Coast Guard Certificates of Discharge to the Union Vacation Plan, which issues checks and vacation vouchers to them. The vouchers list the components of the vacation benefit calculation, including starting and ending work dates, the number of days worked, the vacation rate, the number of vacation days, and the daily wage.

Plaintiff alleges that the vacation benefit is a seamen's wage under 46 U.S.C. § 10313 and that the 1985 MOU, which reduced the benefit, was an illegal agreement under 46 U.S.C. § 10317. For these reasons, Plaintiff argues that part of his wages were wrongfully withheld and that he is entitled to recover the amount withheld plus the statutory penalty.

## II. Summary Judgment

### A. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. See id., 477 U.S. at 248, 106 S.Ct. at 2510. The mere *existence* of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

---

**6.** Article II, section 2 of the Agreement and Declaration of Trust establishing the Union Vacation Plan states, "The purpose of the [Union] Vacation Plan is to provide vacation pay for the Employees who are eligible for benefits as determined by the Trustees hereunder ...." Article IV, section 11 provides, "The Trustees hereby agree ... to accept and administer the Fund for the purposes herein provided ...."

**7.** Plaintiff alleges that Maersk Line "decided that it needed to eliminate what it regarded as duplicative benefits-plan payments," and thus

"authorized and directed" the Union to dock Union members' vacation benefits, but Plaintiff provides no evidence of any "decision," "authorization," or "direction." Maersk Line, on the other hand, presents the deposition testimony of both the Union official who signed the 1985 MOU and Maersk Line's Director of Commercial Operations. This testimony indicates that the Union unilaterally decided to make these concessions to *all* of its employers, not just Defendants, in an effort to save jobs at a time when the American maritime industry was suffering economically.

summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.,* 477 U.S. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691, 694 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont De Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (quoting Fed.R.Civ.P. 56(e)).

## B. "Wages" Under 46 U.S.C. § 10313

The viability of Plaintiff's claim for wages and penalty wages depends on whether the vacation benefit provided in Article II, section 6 of the CBAs is a "wage" within the meaning of 46 U.S.C. § 10313, the statute under which Plaintiff seeks recovery, which states:

> (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier.... (g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

The Court holds that Plaintiff's vacation pay is *not* a wage within the meaning of section 10313.

■ Seamen's wage and wage penalty statutes, which date back to 1790, were intended to protect seamen from arbitrary and unscrupulous refusals by employers to pay seamen's wages after a voyage. Requiring prompt payment was intended to prevent shipowners from threatening nonpayment as a means to force seamen to release the ship of all claims. *See Petersen v. Interocean Ships, Inc.,* 823 F.2d 334, 336 (9th Cir.1987) (citing *Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930)); *see also Alier v. Sea Land Serv., Inc.,* 465 F.Supp. 1106, 1114 (D.P.R.1979). The statutes assume that shipowners owe seamen their wages upon completion of duty. But today, much of a seaman's compensation, such as the vacation benefit in this case, is owed neither directly to the seaman by his employer nor immediately upon completion of a voyage. As the Ninth Circuit pointed out, either

these deferred-payment programs are not the type of wages contemplated by the wage penalty statutes, or all of these benefits programs violate section 10313(f). *See Petersen,* 823 F.2d at 336 (holding that if "comp time earnings," which were paid periodically to seamen between voyages, "are wages[,] the entire [deferred-payment] program runs afoul of section[ ] 10313 ...").

To determine whether the Defendants' contributions to the Union Vacation Plan are wages under the wage penalty statute, the Court considers two questions: "first, is [the payment] for services rendered to the ship, and second, does [the payment program] permit practices that the seamen's wage statutes were intended to prevent." *Petersen,* 823 F.2d at 336. Whether vacation pay is compensation for services rendered to the ship is an unsettled question in wage penalty cases and depends on when and how the payment is made. *See, e.g., id.* at 337 (holding that "comp time pay" owed during slack periods was not payment for services rendered to the ship); *Mateo v. M/S KISO,* 805 F.Supp. 761, 780–81 (N.D.Cal.1991) (holding that "vacation pay" that was "payable *during or immediately following* the completion of plaintiffs' service" was a wage under section 10313) (emphasis added).

■ The second question, whether the payment program "permit[s] practices that the seamen's wage statutes were intended to prevent," is easier to answer. As the Ninth Circuit stated, "The existence of the comp time program would not allow [the

ship owner] to put [the seaman] ashore without first paying him his base wages earned during the voyage." *Petersen,* 823 F.2d at 337. The same is true here. Thus, this Court's narrow holding is that Plaintiff's vacation benefits, which were separate from his base wages and were payable some time after discharge through an independent entity upon application by the seaman, are not wages under the 46 U.S.C. § 10313.[8]

The definition of "wage" is important in other areas of maritime law, such as claims for maintenance and cure and for preferred maritime liens. In maintenance and cure cases, courts generally consider vacation pay to be wages, regardless of how the payment is made. *See, e.g., Lipscomb v. Foss Mar. Co.,* 83 F.3d 1106, 1109–10 (9th Cir.1996) (holding that "ATO [accumulated time off] is a benefit directly attributable to the seamen's work on the vessel and is an inherent part of his wage agreement. It is a way of deferring wages so that the seaman receives compensation during the time he is not on board the ship"); *Morel v. Sabine Towing & Transp. Co.,* 669 F.2d 345, 346 (5th Cir.1982) (holding that "[a]ccumulated leave time, paid vacation, is part of a seaman's total wages .... For all practical purposes, paid vacation is merely a method of deferring wage payments"). Notably, *Lipscomb* distinguishes *Petersen:*

> *Petersen* is based on, and limited to, the penalty wage statutes ..., a separate body of law .... The purpose of the penalty wage statutes is to secure prompt payment of seamen's wages and

---

**8.** The Court is not holding, as at least one court has, that these payments are not wages *because* their payment is contractually deferred. *See Lindsey v. Am. Coastal & Foreign Shipping Co.,* No. 83Civ. 7123(RWS), 1984 WL 1065, at *3 (S.D.N.Y. Oct. 19, 1984) (holding that contributions to a union pension fund were not wages *because* they were not due within the time specified in the statute). Such a holding might allow a shipowner to contractually defer all payments and thus eliminate "wages." The Court simply holds that the vacation payment in this case does not permit practices that the wage penalty statutes were intended to prevent, and thus is not a wage under 46 U.S.C. § 10313.

thus "protect them from the harsh consequences of arbitrary and unscrupulous action of their employers." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 572, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). The statute "obviously ... has no relation to [maintenance-wage-cure] wages which ... reflect the law's concern for the seamen becoming sick, disabled, or ill in the service of the ship." *Isthmian Lines v. Haire*, 334 F.2d 521, 523 (5th Cir.1964).

*Lipscomb*, 83 F.3d at 1110.

In preferred maritime lien cases, courts generally do not consider vacation payments (or any other payments) made through Union funds to be wages. The Fifth Circuit's position is that contributions to pension, welfare, and vacation trusts are not seamen's wages giving rise to a preferred maritime lien. *See Barnouw v. S.S. Ozark*, 304 F.2d 717, 719–20 (5th Cir.1962); *cf. Banco de Credito Indus., S.A.*, 990 F.2d 827, 836–37 (5th Cir. 1993) (noting that "[e]very published opinion addressing employer contributions to pension-type benefit plans ... has concluded that such contributions are not 'wages of the crew'") (quoting *Prudential Ins. v. U.S. Lines, Inc.*, 915 F.2d 411, 412 (9th Cir.1990)). The preferred maritime lien definition of wage, unlike the maintenance and cure definition, bears some relation to wage penalties: the penalty assessed under 46 U.S.C. § 10313(g) is, itself, a "wage of the crew" under the preferred maritime lien statute. *See West Winds*, 720 F.2d at 1102 n. 4. Thus, it makes sense to attempt to reconcile the definitions of wage in these two areas of law, which the Court does here in holding that the contributions to the Union Vacation Plan are not wages.

### C. Application of 46 U.S.C. § 10313

▮ Alternatively, the Court holds that even if Plaintiff's vacation pay were a wage, Plaintiff's wage penalty claim would fail because the pay was not wrongfully withheld. The statutory requirements for imposing a wage penalty are (1) the master or owner refused to pay wages within the specified period, and (2) this failure to pay was without sufficient cause. *See Griffin*, 458 U.S. at 570, 102 S.Ct. at 3249; *see also* 46 U.S.C. § 10313. Defendants do not dispute that the one-day deduction occurred. But Defendants contend that this deduction was made pursuant to the 1985 MOU signed by the Union and the E Companies. A Union is its members' exclusive bargaining agent in the negotiation and administration of a collective bargaining agreement. *See Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964); *cf. Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir.1985) (stating that "[m]aritime law embraces the principles of agency"). Although an employer cannot rely on a bargaining agent's apparent authority when the employer has knowledge to the contrary, *see Goclowski v. Penn Cent. Transp. Co.*, 571 F.2d 747, 759 (3d Cir.1978), Plaintiff has shown no evidence indicating that the Union was not authorized to negotiate the terms of its members' employment. Furthermore, the Court does not agree with Plaintiff's argument that the 1985 MOU violated 46 U.S.C. § 10317, which states:

A master or seaman by any agreement other than one provided for in this chapter may not forfeit the master's or seaman's lien on the vessel or be deprived of a remedy to which the master or seaman otherwise would be entitled for the recovery of wages. A stipulation in an agreement inconsistent with this chapter, or a stipulation by which a seaman consents to abandon a right to wages if the vessel is lost, or to abandon

a right the seaman may have or obtain in the nature of salvage, is void.

In agreeing to reduce Union members' vacation pay by approximately one day per year, the seamen were not "deprived of a *remedy* which the master or seamen otherwise would be entitled for recovery of wages." 46 U.S.C. § 10317 (emphasis added). Vacation pay is not a "remedy;" in this case, it is a contractual right, which was validly modified by an agreement between the Union and the employers. Thus, no wages were withheld from Plaintiff. Stated another way, anything that was withheld, was withheld with sufficient cause in accordance with the 1985 MOU.

### D. Laches

■ Alternatively, the Court holds that Plaintiff's claim is barred by laches. "The equitable doctrine of laches has immemorially been applied to admiralty claims to determine whether they have been timely filed." *DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 15 (2d Cir.1983). Determining whether laches applies is generally left to the discretion of the trial court, whose decision will not be overturned absent an abuse of discretion. *Id.* "The questions to be answered in the exercise of the district court's discretion are whether there existed satisfactory excuse for the delay in bringing the cause of action and whether allowing the action to go forward despite the delay would unfairly prejudice the defendant." *Id.; see also Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) ("Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and

(2) prejudice to the party asserting the defense.").

■ Fanos joined the Union in 1988. "Under ordinary agency concepts the knowledge of an agent is imputed to his principal." *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983). Thus, knowledge of the 1985 MOU of which he complains is imputed to him. Additionally, Fanos received vacation vouchers along with his vacation pay. These vouchers, dating from 1992 through 1999, evidence the deduction. Although the vouchers do not explicitly state that one day has been deducted from Fanos's "days worked," the deduction is clear if one counts the number of days from the "from" date to the "to" date and compares it to the listed "days worked." On each and every voucher, from the first in 1992 to the last in 1999, the listed "days worked" is one day less than the number of days that would be counted. Thus, the Court determines that Fanos has had constructive knowledge of the deduction for at least ten years. Given the double penalty mandated by the seamen's wage statute, this very long delay would cause extreme prejudice to Defendants if the case were allowed to go forward.[9] Thus, laches applies and bars Plaintiff's claim.

### III. Dismissal

Defendants also filed a Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure. A.P. Moller Inc.[10] moved the Court to dismiss the case for lack of personal jurisdiction under Rule 12(b)(2), and the E Companies moved the court to dis-

---

9. If Plaintiff lost a total of six vacation days, at an average daily rate of $150.00 per day, his actual lost wages would be $900.00. Applying the double penalty mandated by 46 U.S.C. § 10313(g), Defendants calculate that Plaintiff's claim exceeds $4 million.

10. The Parties dispute whether A.P. Moller *Inc.* or A.P. Moller *Group* is actually a Defendant in this case. The Court does not resolve this issue.

miss the case for lack of personal jurisdiction and for insufficiency of service of process under Rule 12(b)(5). The Court does not reach these jurisdictional questions because the case has been resolved on substantive grounds.

## IV.

For all of the reasons set forth above, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment, **DENIES** Plaintiff's Motion for Partial Summary Judgment, and, accordingly, **DOES NOT REACH** Defendants' Motion to Dismiss. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.** Each Party is to bear its own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**