INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellee,

v.

S/S AMERICAN ARGOSY, her engines, tackle, boilers, etc., United States Lines, Inc., Yemen Express Service, Division of Transmodal Cargo Carriers, Inc. and YES-Yemen Express Service, Defendants,

S/S American Argosy, her engines, tackle, boilers, etc., and United States Lines, Inc., Defendants-Appellants.

No. 540, Docket 83–7719.

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1984.

Decided April 11, 1984.

Richard C. Burns, New York City (Gulmi, LaPenta, Burns & Mahoney, New York City, of counsel), for appellants.

Jeffrey L. Shernoff, New York City, for appellee.

**300**

Dewey R. Villareal, Jr., Tampa, Fla., Richard E. Reppetto, New York City, Michael J. Ryan, Maritime Law Ass'n Committee on Bills of Lading, New York City (Gordon W. Paulsen, President, Graydon S. Staring, First Vice-President, Francis J. O'Brien, Second Vice-President, New York City, Maritime Law Ass'n, of counsel), for amicus curiae Maritime Law Ass'n.

C. Jonathan Benner, Gen. Counsel, Robert D. Bourgoin, Deputy Gen. Counsel, Carol J. Neustadt, Atty., Federal Maritime Comm'n, Washington, D.C. (John S. Koppel, Atty. Appellate Staff, Civil Div., U.S. Dept. of Justice, Washington, D.C., of counsel), for amicus curiae Federal Maritime Comm'n.

Freehill, Hogan & Mahar, New York City (Eric E. Lenck, Peter J. Gutowski, New York City, of counsel), for amicus curiae The West of England Ship Owners Mut. Prot. & Ind. Ass'n (Luxembourg).

Before MANSFIELD, PIERCE and WINTER, Circuit Judges.

MANSFIELD, Circuit Judge:

Defendants, the S/S American Argosy and her owner, United States Lines (USL), appeal from a judgment of the Southern District of New York (Werker, J.) awarding the plaintiff Insurance Company of North America $8,157.84 for damage to its insured's cargo. Because of the small sum involved, the district court at the parties' request disposed of the case pursuant to "old" Local Admiralty Rule 15.[1] It found the American Argosy liable *in rem* for an unauthorized bill of lading issued by its co-defendant Transmodal Cargo Carriers, holding that the ship ratified the bill by setting sail with the covered cargo aboard. Because we find the ratification doctrine inapplicable, we reverse.

In November 1980 the Yemen Highway Authority ordered four cartons of tools from Educational Systems International (Edusystems), a Wisconsin firm. The invoice called for the tools to be shipped from New York to Hodeidah, Y.A.R. via Yemen Express Service. Yemen Express Service was a division of Transmodal Cargo Carriers, Inc. (Transmodal); for the purposes of this appeal, the two entities are interchangeable. Within the shipping industry Transmodal functioned as a "non-vessel op-

---

1. At the time of trial, Local Admiralty Rule 15 of the Southern District of New York provided:
  "Rule 15. Rules for Summary Determination on Consent of Admiralty and Maritime Claims Not Exceeding $25,000
  (a) These rules shall apply to admiralty and maritime claims within the meaning of rule 9(h) of the Federal Rules of Civil Procedure and which do not exceed $25,000. They shall not apply to personal injury or death claims, nor to claims for maintenance and cure, wages or wage penalties, and claims of a similar nature.
  (b) Claims subject to these rules may be submitted for summary determination on consent in accordance with these rules by filing a stipulation for a summary determination with the judge assigned to the cause.
  (c) Testimony may be presented by the personal attendance of witnesses, by deposition, by stipulation of facts, by documentary evidence, by affidavits and by any other papers which may be considered on a motion for summary judgment pursuant to rule 56(c) of the Federal Rules of Civil Procedure provided that the determination and the form of such affidavits shall not be subject to the rule governing summary judgment. Copies of affidavits and documents to be offered in evidence will be submitted with the consent order for summary determination.
  (d) Proceedings under these rules shall not be governed by the rules of evidence and the court may consider copies of documents stated to be accurate by counsel in place of the originals, although the court may apply such rules of evidence in its discretion.
  (e) The procedure to be followed in obtaining a summary determination shall be prescribed in each case at a preliminary conference before the judge assigned to the cause.
  (f) The court's determination shall not be subject to review on appeal, except as to any specific questions of law which counsel have requested the court to decide.
  (g) Findings of fact and conclusions of law need not be made in a proceeding for summary determination and are deemed waived, unless a question of law is involved in accordance with the provisions of subdivision (f) of this rule. In such cases proposed findings of fact and conclusions of law shall be made."
  The Local Admiralty Rules have since been revised; "old" Rule 15, with minor revisions, is now Rule 16.

erating common carrier" (NVOCC).[2] NVOCCs operate as middlemen; they arrange for relatively small shipments to be picked up from shippers, consolidate the smaller parcels, and ship them via a carrier or several carriers. They do not, however, own or charter the ships that actually carry the cargo. *See New York Foreign Freight Forwarders and Brokers Ass'n v. Federal Maritime Commission*, 337 F.2d 289, 292 (2d Cir.1964), *cert. denied*, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965) (discussing analogous Interstate Commerce Act concept of "freight forwarder").[3]

Thus, for the purposes of the Shipping Act, 46 U.S.C. §§ 801, *et seq.*, the NVOCC is a hybrid; it is a common carrier with respect to the shippers who use its services; as such it files a rate tariff with the Federal Maritime Commission and is subject to all laws governing common carriers. With respect to the vessel and her owner, however, the NVOCC is an agent of the shipper, and thus merely a customer—indeed, only one customer among hundreds on any given voyage. *See generally Chicago, Milwaukee, St. Paul and Pacific R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 467–68, 69 S.Ct. 692, 693–94, 93 L.Ed. 817 (1949).

Edusystems packed the tools and delivered them to Transmodal, which had previously obtained a 20-foot steel container from USL. Transmodal consolidated the four Edusystems cartons with eight other shipments, putting all into the USL container and delivering the container to USL. USL issued a bill of lading dated December 13, 1980, for one 20-foot container, said to contain 117 pieces of "mixed commodities." The USL bill of lading named Transmodal as the shipper and called for shipment from New York to Rotterdam aboard the American Argosy. It is undisputed that the container was indeed delivered to Transmodal's agent in Rotterdam without incident or damage.

Transmodal, without USL's knowledge or authority, issued its own bill of lading to Edusystems, also dated December 13, 1980. The Transmodal bill of lading provided for carriage of the four cartons aboard the American Argosy from New York to Hodeidah. The cartons were transshipped from Rotterdam to Hodeidah by an agent of Transmodal aboard another vessel, the M/V Jytte Danelsen. The tools were discharged at Hodeidah on February 10, 1981, and delivered to the consignee on April 1. A survey performed on June 29, 1981, found the tools to be damaged and concluded that the damage had occurred during transshipment. It was not until November 1981, when the Insurance Company of North American (INA) presented it with a damage claim, that USL first learned of the Transmodal bill of lading.[4]

When USL disclaimed liability on the Transmodal bill, INA instituted this suit. In view of the small amount of money involved, the parties agreed to submit the case for summary disposition under the Southern District's Local Admiralty Rule 15. On June 10, 1983, Judge Werker issued a written memorandum opinion with

---

**2.** Title 46 C.F.R. § 510.2(*l*) provides:

"'Nonvessel operating common carrier by water' is a common carrier by water as defined in section 1 of the Act, which does not operate the vessels by which its ocean transportation is provided but which holds itself out, by the establishment and maintenance of tariffs, by advertisement, solicitation, or otherwise, to provide transportation of property for hire by water in commerce from the United States; which assumes responsibility or has liability imposed by law for the safe transportation of such property; and which arranges in its own name for the performance of such transportation by underlying water carriers."

**3.** "Freight Forwarders" are defined and regulated by Part IV of the Interstate Commerce Act. The Shipping Act contains no express provisions relating to NVOCCs, but Federal Maritime Commission Regulations treat NVOCCs exactly as freight forwarders are treated under the Commerce Act. *See New York Foreign Freight Forwarders & Brokers Ass'n v. ICC*, 589 F.2d 696, 705 n. 48 (D.C.Cir.1978).

**4.** Our ruling on the ratification issue makes it unnecessary to reach USL's claim that the long delay before it was notified precludes a finding that the cargo was damaged before or during discharge from the transshipment vessel.

findings and conclusions in which he ruled for the plaintiff, holding both Transmodal and the American Argosy liable on the Transmodal bill of lading in the amount of $8,157.84. Judge Werker found that while USL was not liable *in personam* on the bill, since it could not ratify a bill of which it was unaware, the ship itself was liable *in rem*. From the resulting judgment the American Argosy appeals.

The Federal Maritime Commission, the Maritime Law Association of the United States, and The West of England Ship Owners Mutual Protection and Indemnity Association, as *amici curiae*, urge reversal. Transmodal is no longer in business and plaintiff INA has chosen not to participate in the appeal other than to have its counsel file a letter brief in support of affirmance.

### DISCUSSION

■ The threshold question is whether the district court's judgment, entered under "old" Local Admiralty Rule 15, is appealable. Section (f) of the Rule provides:

> "(f) The court's determination shall not be subject to review on appeal, except as to any specific questions of law which counsel have requested the court to decide."

Section (g) provides that findings of fact and conclusions of law need not be made "unless a question of law is involved in accordance with the provisions of subdivision (f)...." The rule thus contemplates a summary determination on consent of small admiralty claims informally presented to the court but allows the parties nevertheless to seek findings and conclusions, from which an appeal may be taken, in a case which, notwithstanding the small amount at stake, presents a difficult legal question.

The present case clearly raises a difficult legal question of broad and unusual significance, namely, whether a ship may be held liable on a bill of lading issued by an NVOCC without the authorization of the ship's owner or charterer. The parties recognized its importance by filing detailed written briefs (plaintiff's brief is 14 pages and defendant's 10 pages) with respect to the question in the district court. Judge Werker appears also to have been under the impression that the parties wanted a detailed decision (eight pages) setting forth written findings of fact and conclusions of law instead of a summary disposition.

In view of these circumstances we are persuaded that the conditions for appealability prescribed by "old" Admiralty Rule 15(f) and (g) have been satisfied and that appellate jurisdiction has not been foreclosed. Although the parties did not specifically use the word "request" found in Rule 15(f), their detailed briefing of the legal question amounted to a request for the conclusions of law urged by them, bringing the case within the exception provided in § (f), *supra*.

Turning to the merits, i.e., whether the ship may be liable upon an unauthorized bill of lading issued by an NVOCC, we start with the oft-stated proposition that "the doctrine of the ship as a jural entity is not one to be expanded." *Latus v. United States*, 277 F.2d 264, 267 (2d Cir.), *cert. denied*, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960); *see also* G. Gilmore & C. Black, The Law of Admiralty, at 616 (2d ed. 1975). The *in rem* liability of a ship is a fiction; the reality is that the owner, not the vessel, pays the judgment. In this case the owner cannot be said to have ratified the bill of lading; one cannot ratify an unauthorized agreement of which one is wholly unaware. *See generally* Restatement (Second) of Agency § 91. To impose liability on the owner anyway on the theory that the ship may be held responsible is a potentially perverse result. As the Supreme Court has noted:

> "To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. A man's liability for a demand against him is measured by the property that may be taken from him to satisfy that demand. In the matter of liability, a man and his property cannot be separated ...." *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 24,

80 S.Ct. 1470, 1473, 4 L.Ed.2d 1540 (1960) (quoting *The City of Norwich*, 118 U.S. 468, 503, 6 S.Ct. 1150, 1162, 30 L.Ed. 134 (1886)).

No reason is offered for subjecting a ship to different ratification principles than those governing any other principal, such as its owner. The district court relied on a line of cases holding that a ship, by setting sail with the goods on board, may be deemed to have ratified a bill of lading that was neither issued nor authorized by its Master. *See Demsey & Assocs. v. S.S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir.1972); *British West Indies Produce, Inc. v. S/S Atlantic Clipper*, 353 F.Supp. 548, 554 (S.D.N.Y.1973); *Tube Prods. of India v. S.S. Rio Grande*, 334 F.Supp. 1039, 1041 (S.D.N.Y.1971). These decisions, however, are clearly distinguishable from the present case in one significant respect: in each case the bill of lading was issued by a *charterer* of the vessel and not, as here, by an NVOCC or similar unauthorized third person.

A charterer is not one of several hundred customers contracting with the carrier for the carriage of a discrete package of goods. To the contrary, a charterer, unlike an NVOCC, contracts for the use of the ship itself. " 'A charter party is the hiring of the whole or a part of the vessel ... and if it does not, ex vi termini, convey a proprietary interest, it certainly does pass a claim or interest in the vessel, recognized by the maritime law, the privilege to look upon her as answerable for the goods placed on board.' " *Tube Prods. of India v. S.S. Rio Grande, supra*, 334 F.Supp. at 1040 (quoting *Vandewater v. The Yankee Blade*, 28 F.Cas. 980, 981 (C.C.S.D.Cal.1855) (No. 16,-847), *aff'd*, 60 U.S. (19 How.) 82, 15 L.Ed. 554 (1856)); *see generally* Gilmore & Black, *supra*, ch. IV. Thus, the charterer has control of the ship, at least temporarily, and is expected to issue bills of lading. Even if the ship's Master does not see the bill, he is fully aware that one must exist; it is this awareness that underlies the ratification doctrine. "[T]he master must know [when he sets sail] if he has not himself signed any bills of lading, that the charterer has done so, and to sail is to accept those outstanding." *The Blandon*, 287 F. 722, 723 (S.D.N.Y.1922). The corollary is that in a charter situation the Master, unlike USL here, would not himself have issued any bills of lading for the cargo at issue. Thus, in *The Muskegon*, 10 F.2d 817, 820 (S.D.N.Y.1924), the court specifically noted that the Master had set sail "without issuing other bills of lading." Here, of course, the ship *did* issue its own bill for the Edusystems shipment, and the American Argosy's Master had no reason to suspect that one of its many customers might issue a bill of lading purporting to provide for carriage to Hodeidah.

■ For these reasons we hold that the decisions relied upon by the district court, in which the charter-party relationship was crucial to the finding of ratification, are inapplicable to the present case, where no such charter-party relationship exists. In our view the doctrine of ship-ratification does not extend beyond the charter-party relationship.

■ Our ruling is not motivated by an abstract concern for doctrinal purity but by our objection to the expansion of a common carrier's liability beyond the limits of logic and Congressional policy. The result below is also inconsistent with existing federal maritime law. First, the district court found USL liable on a bill of lading which provides for a service—shipment to Hodeidah—that USL was not legally permitted to offer. Pursuant to § 18(b)(1) of the Shipping Act, 46 U.S.C. § 817(b)(1), carriers must file tariffs with the Federal Maritime Commission identifying their rates and the ports they serve. The tariff system is designed to prevent rate discrimination; shippers are conclusively presumed to have knowledge of the tariff's terms and are bound by them. *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97–98, 35 S.Ct. 494, 495–496, 59 L.Ed. 853 (1915); *see also United States v. Pan American Mail Line, Inc.*, 359 F.Supp. 728, 733 (S.D.N.Y. 1972). USL subscribes to the tariff published by the North Atlantic Continental

**304**

Freight Conference, No. FMC–5; that tariff does not provide for service to Hodeidah. Indeed, were USL to provide such service it would be subject to a substantial fine under 46 U.S.C. § 817(b)(6). To find the American Argosy liable in the present case would clearly conflict with the policies embodied in the tariff system.

■ The district court's decision would also threaten the role of the bill of lading as an effective means for carriers to limit their liability. Under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5), the carrier's liability is limited to $500 per package "unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." Moreover, the bill of lading constitutes prima facie evidence of a cargo's value, thereby preserving the carrier's ability to appraise its potential liability and to obtain appropriate insurance. Expanding the doctrine of ratification to cover bills issued by NVOCCs, however, would undermine that policy. A carrier can and does insure itself against improvident bills issued by a time charterer, a single entity. It would be both expensive and perhaps impossible to obtain such protection against the acts of each of the hundreds of shippers and middlemen who book freight on each voyage. Even if coverage were available the effect would be to increase the cost of shipping substantially—a result Congress sought to avoid in enacting the existing statutory scheme.

■ In short, the relationship of the NVOCC to the vessel is too insubstantial to permit adoption or application of a ratification doctrine based solely on carriage of the goods. The decision below is not only inconsistent with several provisions of the Shipping Act but would work an undesirable change in American maritime law. Accordingly the judgment of the district court is reversed with directions to dismiss the complaint against the American Argosy.