**FINORA COMPANY, INCORPORATED,**
**Plaintiff–Appellee,**

v.

**AMITIE SHIPPING, LIMITED,**
**Defendant–Appellant.**

**No. 94–1853.**

United States Court of Appeals,
Fourth Circuit.

Argued April 5, 1995.

Decided May 22, 1995.

**ARGUED:** Dennis James Christensen, Wise & Cole, P.A., Charleston, SC, for appellant. Douglas Manning Muller, Buist, Moore, Smythe & McGee, P.A., Charleston, SC, for appellee. **ON BRIEF:** D. Kay Tennyson, Wise & Cole, P.A., Charleston, SC, for appellant. Benjamin Allston Moore, Jr., Buist, Moore, Smythe & McGee, P.A., Charleston, SC, for appellee.

Before ERVIN, Chief Judge, and WILKINSON and WILKINS, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge ERVIN and Judge WILKINS joined.

## OPINION

WILKINSON, Circuit Judge:

The issue in this admiralty case is whether vessel owners with contractual liens on subfreights owed to charterers of their vessels must give actual notice of those liens to third-party obligors. Because vessel owners are in the best position to disclose the existence of such liens, we think actual notice is required. The district court found that the vessel owner in this case failed to provide such notice and thus declined to enforce the lien. We affirm.

### I.

Appellant Amitie Shipping Limited ("Amitie") owns the vessel christened *The Amitie.* In February of 1992, Amitie and Crown Marine Mueller, Inc. ("Mueller"), entered into a time charter, in which Amitie leased *The Amitie* to Mueller for four to six months. Under the agreement, the charter hire was $5,600 per day plus expenses, payable every fifteen days. In the event that Mueller, the charterer, failed to remit charter hire, the time charter granted Amitie an express lien on subfreights earned by Mueller. Specifically, it provided that "the Owners shall have a lien upon all cargoes, and for all subfreights for any amounts due under this Charter."

Mueller in turn subchartered *The Amitie* to the Finora Shipping Company ("Finora") for a trip from Bangladesh to the United States. The voyage charter provided that Finora would pay Mueller a net total of $326,040 in subfreights. The voyage charter also stipulated the amount of laytime (time for loading and unloading of cargo allowed free of charge); if laytime was exceeded, Finora would owe Mueller a sum known as demurrage. According to the voyage charter, Mueller would be responsible for all port expenses incurred during the trip. The charter did not name the American port of destination but specified that Finora would nominate it later. The bills of lading subsequently identified Wilmington, North Carolina, as the discharge port.

Although the voyage charter provided that *The Amitie* would be ready to load in Bangladesh on April 29, 1992, she was not. The delay was due to a disagreement between Mueller and a prior shipper who claimed its cargo had not been delivered in full. On May 4, 1992, *The Amitie* was delivered to Finora for loading. After the cargo was stowed, The Amitie lifted anchor and started toward the United States. As she traveled across the Atlantic, Mueller's charter payments to Amitie periodically came due. Mueller was late in remitting the monies from the outset, and began to fall even further behind as the voyage continued.

A series of negotiations between Finora, Amitie, and Mueller thus ensued. In light of Mueller's late payments, Finora suggested to Amitie that it terminate the original time charter with Mueller and charter the vessel directly to Finora. Amitie rejected that suggestion. Mueller then instructed Finora to pay the subfreights as follows: Finora should disburse $181,142.80 to Amitie to cover Mueller's unpaid charter hire and remit the remaining $127,737.20 to Mueller. Mueller threatened to seize Finora's cargo and to report it to a shipowner's organization if Finora failed to comply. Amitie, on the other hand, was demanding the full subfreights from Finora. Amitie never alluded to any contractual lien; instead, it based its demand on the ground that Mueller had assigned it the right to the subfreights. On June 5, 1992, Finora paid the subfreights according to Mueller's instructions. Amitie continued to claim the $127,737.20 that Finora paid to Mueller. A few days later, Amitie notified

Mueller that it was withdrawing the vessel from Mueller's service.

Meanwhile, *The Amitie* approached the coast of South Carolina. Finora ordered that the cargo be unloaded at Georgetown, South Carolina, but the bill of lading indicated Wilmington, North Carolina as the port of discharge. The dispute regarding the subfreights was also ongoing; Amitie was now claiming that it had a lien on Finora's cargo for over $480,000. While the parties attempted to settle their differences, *The Amitie* waited off the port of Georgetown, South Carolina. She remained there for ten days, until Finora agreed to place $150,000 in escrow so that Amitie would release its cargo. Because Amitie refused to pay port expenses at Georgetown, Finora was forced to pay them.

Several months later Finora brought this declaratory judgment action against Amitie to settle the various disputes arising out of the preceding events. After a bench trial, the district court held that because Amitie did not give Finora "clear notice" of the lien on subfreights before Finora paid the $127,-737.20 to Mueller, Amitie could not now recover that sum from Finora. The court also ruled against Amitie on other counterclaims, but did award Amitie nominal demurrage. From these rulings, Amitie now appeals.

## II.

■ Amitie's main contention is that the district court erred in requiring clear notice of liens on subfreights. Amitie presses a rule of constructive notice, arguing that it is both well-settled law and sound policy. We hold, however, that to perfect liens on subfreights for unpaid charter hire, vessel owners must give *clear* notice to third parties *before* those parties pay subfreights to charterers. The notice should inform third-party obligors of the existence of the lien, the legal basis for the lien, and the fact that the lienholder intends to exercise it. If clear notice is not provided, the third party's obligations are discharged by payment to the charterer.

## A.

Appellant correctly notes that *The Solhaug*, 2 F.Supp. 294 (S.D.N.Y.1931), held that third parties bear the burden of determining whether the original charter party creates any liens on subfreights for unpaid charter hire. That case did refer to a standard of "actual or constructive notice." *Id.* at 300. But more recent cases from that district suggest that constructive notice to third parties is insufficient to perfect liens on subfreights. *See Cornish Shipping v. Ferromet,* 1995 A.M.C. 235, 243 n. 3, 1994 WL 171717 (S.D.N.Y.1994) (perfection by "service on [shipper's] agent of a [written] notice of lien"); *Saint John Marine Co. v. United States,* 1994 A.M.C. 2526, 2528, 1994 WL 281937 (S.D.N.Y.1994) (noting that "[t]he extent of notice required to perfect a lien on subfreights is unsettled"); *In re North Atlantic & Gulf Steamship Co.,* 204 F.Supp. 899, 904 (S.D.N.Y.1962) ("The only requirement is that the shipper have *actual notice* of the lien.") (emphasis added), aff'd, 320 F.2d 628 (2d Cir.1963). Furthermore, commentators have noted that *The Solhaug* stands alone in its acceptance of constructive, as opposed to actual, notice. *See* Schoenbaum, *Admiralty and Maritime Law* § 10–11 n. 25 (1987).

Indeed, the weight of the case law counter to appellant's position decisively tips the proverbial scales. *See American Steel Barge Co. v. Chesapeake & O. Coal Agency Co.,* 115 F. 669, 676 (1st Cir.1902) (holding that shipper "had not . . . been advised that the owner of the vessel had reserved in the charter any lien on the subfreight . . . and the absence of that knowledge protected [it] in the payment [of the subfreights] on rules so well settled and so universally known that it would be a waste of words to discuss that particular proposition"); *Berdex Int'l, Inc. v. M.V. Kapitan Grishin,* 1992 A.M.C. 1559, 1563, 1992 WL 361752 (N.D.Cal.) (requiring "clear notice"); *see also Biehl & Co. v. Apollonia Holding, Inc.,* 693 F.Supp. 457, 466–67 (E.D.La.1988).

Moreover, where courts have recently found sufficient notice, it is most often based on written documents that inform third parties of liens in unambiguous terms. *See, e.g.,*

*Tarstar Shipping Co. v. Century Shipline, Ltd.*, 451 F.Supp. 317, 320 n. 6 (S.D.N.Y. 1978) (owner sent written notice stating that "Owners hereby exercise their lien granted under the terms of the Charter Party on any freights or subfreights owed from you to [charterer].... You are cautioned that if you pay to [charterer] despite this Notice of Lien you will have to pay twice"), *aff'd*, 597 F.2d 837 (2d Cir.1979); *St. John Marine*, 1994 A.M.C. at 2526 (owner sent telex stating "[charterer] have [sic] failed to pay owners monies.... Owners are therefore obliged to exercise their rights of lien in respect of and over all and any freights or subfreights including any sums that may still be payable by you. Should you ignore this notice and make any payment [to charterer] I must advise you that you will be at risk of having to make such payment twice"). Thus, while cases like *The Solhaug* suggest that constructive notice is sufficient, the modern trend in admiralty is plainly toward an actual notice rule.

### B.

■ Actual notice is, for several reasons, the better rule in cases involving liens on subfreights for unpaid charter hire. It must be remembered that such liens do not arise by operation of the general maritime law, as do most maritime liens. *See 2 Benedict on Admiralty* § 45 n. 5 (1994) (collecting cases). They are purely creatures of contract, and usually spring, as here, from the original charter party between the vessel owner and the charterer. The third party against whom the lien is asserted is, of course, not a party to that contract.

First, the interest of efficiency counsels in favor of clear notice. The risk of loss is the amount of the subfreights: the vessel owner stands to lose the amount of unpaid charter hire represented by the subfreights, and the shipper will lose that same sum if required to pay twice. As between the vessel owner and the shipper, the owner is best situated to avoid that loss. Because the owner was party to the contract creating the lien, it has first-hand knowledge of the lien's existence. The shipper, by contrast, does not; it would have to incur search costs to learn of the lien.

Even then, the shipper may not know whether the owner intends to exercise the lien against the shipper. Only the owner can determine that.

Moreover, vessel owners will normally be the first to recognize a charterer's default (it is, after all, their revenue). To require shippers to monitor charter hire payments would impose a significant burden. And a shipper who does discover that the charterer has missed a payment is ill-suited to ascertain whether default has actually occurred. There may be an assignment of rights, an extension of credit, or some other arrangement between the owner and the charterer—which is, again, information within the owner's ken. Finally, vessel owners can transmit all the foregoing information to shippers with relative ease and little expense. In short, vessel owners can best insure that subfreights are paid to the proper recipient, and are not paid twice.

■ Second, when charterers are in default of hire, shippers, through no fault of their own, are in perilous legal straits. Even though a shipper may be aware of a charterer's financial difficulties, failure to pay subfreights to the charterer as required by the contract for carriage may well be a breach of contract. It could also result in a lien on the shipper's cargo in favor of the charterer. *See 2 Benedict on Admiralty* § 44. As Finora put it to Amitie, "[W]e are in a dilemma here between what is morally prudent, and what is legally correct." Shippers, however, should be entitled to presume that their primary obligation is to the party with whom they are in contractual privity—the charterer. It is up to vessel owners to overcome this reasonable presumption by clearly apprising shippers of their superior contractual right to subfreights.

■ Third, requiring clear notice comports generally with the Uniform Commercial Code. *See* U.C.C. § 22–7 ("[T]he most common and important method of [perfection of security interests] is the filing of a financing statement ... to *notify* a reader that the creditor may claim an interest in the described collateral ....") (emphasis added). Absent reason to do otherwise, we prefer to

adopt rules in admiralty that accord with, rather than diverge from, standard commercial practice.

### C.

In this case, the district court properly held that Amitie bore the burden of providing Finora with actual notice that it possessed a contractual lien on subfreights. The two parties exchanged numerous telexes and their agents met personally. At no point prior to Finora's payment did Amitie suggest that it held a lien, as simple and economical as that would have been. Mueller, on the other hand, was threatening Finora with severe penalties for failure to pay as instructed. Lacking clear notice of Amitie's lien, Finora took what it thought to be the proper route and paid Mueller the subfreights at issue, in accordance with its contract. When Finora in good faith transferred those funds to Mueller, the lien was thereby extinguished. Finora thus need not pay the subfreights twice.

### III.

Amitie also contends that the district court erred in holding it liable for port expenses, denying it additional charter hire, and awarding insufficient demurrage. We think these various contentions lack merit.

The district court first determined that under the voyage charter, Amitie owed Finora for the port expenses incurred at Georgetown. Amitie, of course, was not a party to the voyage charter. But Amitie stepped into the shoes of the charterer and assumed its obligations when it in effect ousted Mueller from control of the vessel in midvoyage. Since Mueller was responsible for port expenses under the voyage charter and bills of lading, the responsibility then fell to appellant. *See Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687, 688 (2d Cir.1952).

The district court also found that Amitie was not due any additional charter hire for the ten days *The Amitie* spent off Georgetown. The reason was that Amitie itself caused the delay, *see Biehl*, 693 F.Supp. at 469, and in less than good faith. In the voyage charter, Finora manifestly reserved the right to nominate the port of discharge.

As the district court put it, "In effect, Amitie Shipping held the ship and its cargo hostage [until Finora posted $150,000 in escrow] under the mistaken belief that it had a lien on the cargo for some $480,000, a claim which it eventually withdrew." We, like the district court, do not think such piratical tactics deserve reward.

Finally, the district court held that appellant was due $270.70 in demurrage, although appellant originally sought $83,535.17. It is true that *The Amitie* lifted anchor at Bangladesh five days later than planned. Voyage charterers, however, are not responsible for delays caused by the owner or subcharterer of the vessel. *See* Schoenbaum, *Admiralty and Maritime Law* § 10–9 ("Laytime will cease to run if loading or unloading is delayed due to the fault of the shipowner or his agents."). Here, the previous shipper refused to release *The Amitie* until the last day of the five-day period because it believed Mueller had mishandled its cargo. Thus Finora was not responsible for the delay in Bangladesh. The hour and twenty minute overrun in laytime that occurred after the vessel berthed in Georgetown justifies the nominal amount of demurrage awarded.

### IV.

For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED.*