United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 18, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 04-20057

_____

LYKES LINES LIMITED;
TMM LINES LIMITED, LLC,

Plaintiffs - Appellees,

VERSUS

M/V BBC SEALAND, *in rem*; ET AL,

Defendants,

BBC CHARTERING & LOGISTICS GMBH & CO KG,

Defendant - Appellant.

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before KING, Chief Judge, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant BBC Chartering & Logistics GMBH & Co. K.G. appeals the judgment of

the district court denying the lien it claimed against cargo owned by Lykes Lines Limited and

TMM Lines Limited, L.L.C. It also appeals the award of a lien against its vessel, the BBC

Sealand, *in rem*, for TMM/Lykes' transshipment costs. We affirm.

1

I.

BBC Chartering & Logistics GBMH & Co., K.G. ("BBC") is the owner of the vessel M/V BBC Sealand ( "Sealand"). Argonaut Shipping International and Pegasus Marine Finance ("Argonaut/Pegasus") are two companies owned by sole shareholder Cosvogiannis.[1] TMM Lines Ltd., LLC and Lykes Lines Ltd. ("TMM/Lykes") was the cargo owner. CPS Ships is the parent of TMM/Lykes.

TMM/Lykes contracted via an agent, JBL, with Argonaut/Pegasus to transport cargo in 89 containers from Itajai, Brazil to Puerto Cabello, Venezuela and to Houston, Texas, at a price of $210,600. Argonaut/Pegasus chartered the Sealand from BBC to transport this and other cargo. No contractual relationship existed between TMM/Lykes and BBC or the Sealand.

The charter agreement between BBC and Argonaut/Pegasus contained a lien provision which provided that the owner (BBC) would have a lien on the cargo for freight and all other amounts due under the charter including costs of recovery.[2] The charter agreement also provided that only the vessel owner, master or owner's agent could issue bills of lading. Charter hire was set at $366,000 payable in a lump sum and the charter agreement stated that the vessel would not leave a loading port until the freight was paid in full.

---

[1] The district court pierced the veil of these companies to treat them as the alter ego of Cosvogiannis and also held that they are the same company.

[2] The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this charter party including costs of recovering same.

On December 14, 2001, the Sealand arrived in Itajai and TMM/Lykes' cargo was loaded. BBC advised Argonaut/Pegasus that the vessel was arriving and that it would not sail from the load port until the freight was paid. Despite the fact that the freight was not paid, the Sealand sailed from Itajai destined for Santos that same day. On December 18, 2001, Argonaut/Pegasus issued bills of lading without authorization from BBC for the cargo loaded in Itajai. The bills of lading contained a lien clause in favor of the "carrier." "Carrier" is defined as "Pegasus and any connecting or substituted Carrier performing transportation under the transportation agreement evidenced by this bill of lading." On December 19th, the Sealand arrived in Santos, Brazil, where cargo belonging to BBC was loaded. On December, 20, 2001, BBC forwarded draft bills of lading for the TMM/Lykes' cargo to Argonaut/Pegasus, noting that originals would come from BBC's Houston office.

The record reflects that on either December 19th or 26th, 2001, TMM/Lykes paid the full amount it owed in freight to Argonaut/Pegasus. CP Ships' corporate representative testified that freight was paid on December 19th by electronic transfer. He acknowledged that the bills of lading issued by Argonaut/Pegasus were marked "freight prepaid" even though on the date of issuance, December 18th, freight had not yet been paid. Receipts from JBL for the payment are dated December 26th. From these facts BBC contends that the payments were made December 26th. The district court did not make a finding on this point.

On January 8, 2002, the Sealand arrived offshore Puerto Cabello where TMM/Lykes' cargo was to be discharged. As it had at various stages of the voyage, BBC demanded payment of freight from Argonaut/Pegasus and advised that the Sealand would wait for 48

3

hours and if freight was not paid, the vessel would transport the cargo to Houston, its next port of call. The parties attempted unsuccessfully to negotiate a compromise. In e-mails BBC acknowledged that CP Ships (TMM/Lykes' parent) had paid Argonaut/Pegasus but that Argonaut/Pegasus had not yet paid BBC. After 48 hours, the Sealand sailed for Houston without discharging TMM/Lykes' cargo.

On January 10, 2002, Argonaut/Pegasus forwarded a copy of the BBC/Argonaut charter party to TMM/Lykes' parent, CP Ships. The next day, BBC advised Argonaut/Pegasus and CP Ships that unless it received all freight due, it would assert a freight lien against the cargo once the vessel arrived in Houston. The Sealand arrived in Houston on January 17, 2002. The cargo was discharged to BBC's warehouse, but later released to TMM/Lykes after posting of security. TMM/Lykes then transshipped the Venezuela cargo from Houston to Venezuela. BBC never received payment due under the charter party.

When the Sealand arrived in Houston, BBC filed a complaint against the cargo *in rem* seeking to enforce BBC's lien for nonpayment of freight. The claim was amended to add an *in personam* claim against Argonaut/Pegasus and Cosvogiannis. TMM/Lykes filed a complaint against the Sealand, BBC and Argonaut/Pegasus alleging breach of contract, damage to the cargo and conversion. TMM/Lykes also arrested the Sealand asserting a maritime lien for its claims. In a separate proceeding, BBC obtained an arbitration judgment against Argonaut/Pegasus.

After a bench trial, the district court entered judgment in favor of BBC against

4

Argonaut/Pegasus and Cosvogiannis for $407,486 and in favor of TMM/Lykes against Argonaut/Pegasus and Cosvogiannis for $124,509. No appeal was taken from these awards. The court also found that the Sealand committed a deviation by failing to deliver the TMM/Lykes cargo to its intended destination, Puerto Cabello, and entered judgment for TMM/Lykes against the Sealand for TMM/Lykes' cost of transhipping the cargo from Houston to Puerto Cabello. The court concluded that BBC was not entitled to a lien against TMM/Lykes' cargo for the vessel's freight charges and denied relief on that claim. BBC and the Sealand appeal.

## II.

BBC argues that the district court erred by finding that BBC could not assert a carrier's lien for freight against TMM/Lykes' cargo, *in rem*. BBC is correct that maritime law recognizes a lien arising as a matter of law in favor of the vessel owner against the cargo for charges including unpaid freight. Gilmore & Black, The Law of Admiralty (2d ed.), § 9-20, n. 103, quoting The Bird of Paradise, 72 U.S. (5 Wall) 545, 554 (1866); see also Tetley, Maritime Liens and Claims (2d. ed.), 786-87; 2 Benedict on Admiralty § 45. However, when cargo is shipped under a charter, this lien only extends to cargo that is owned by the charterer. Id.

The cargo in this case was not owned by the charterer, Argonaut/Pegasus, but by a third party shipper, TMM/Lykes.

> When cargo shipped under a charter is owned by a third party, general maritime law does not give the shipowner a lien against either the cargo or the freight money. Charter parties, however, customarily provide that the owner

5

> shall have lien against cargo and freight and require the charterer to insert appropriate clauses in bills of lading subjecting the bills to the lien provision in the charter.

Gilmore & Black, The Law of Admiralty (2d ed.), § 9-20, n. 103; see also Tetley, Maritime Liens and Claims (2d. ed.), 786-87; 2 Benedict on Admiralty § 45. The charter party between BBC and Argonaut/Pegasus contains such provisions and provides that the vessel owner will have a lien on the cargo for freight and all other amounts due under the charter including costs of recovery.

The lien arising under the charter party does not arise by operation of maritime law, as do other maritime liens. Finora Co. v. Amitie Shipping, 54 F.3d 209, 213 (4th Cir. 1995) (citing 2 Benedict on Admiralty §45 n.5 (1994)). Rather, this lien is a creature of contract and arises from the original charter party between the vessel owner, in this case BBC, and the charterer, in this case, Argonaut/Pegasus. Id. To be enforceable against a third party cargo owner, like TMM/Lykes, who is not a party to the charter party agreement, the vessel owner's lien must be perfected. Id.; Hornbeck Offshore Operators v. Ocean Line, 849 F. Supp. 434, 439 (E.D. Va. 1994). To perfect its lien, the vessel owner must give actual notice of the lien provision in the charter party to the cargo owner before the cargo owner pays its freight to the bill of lading issuer. Otherwise the lien is discharged. Toro Shipping Corp. v. Bacon-McMillan Veneer Mfg. Co., 364 F.2d 928 (5th Cir. 1966); Finora, 54 F.3d at 211-12; Hornbeck, 849 F.Supp. at 439. Actual notice can be given, for example, by incorporating the lien from the charter party in the bill of lading issued to the shipper or by providing a copy of the charter party to the shipper. Hornbeck.

6

The district court found that TMM/Lykes did not have actual notice of the lien provision in the BBC/Argonaut charter party until January 10, 2002, when BBC sent a copy of the agreement to TMM/Lykes. The district court did not make a finding as to when TMM/Lykes paid Argonaut/Pegasus. Although the bills of lading dated December 18th were marked "freight prepaid," CP Ships' corporate representative testified that freight was paid on December 19th by electronic transfer. Receipts from JBL for the payment are dated December 26th. From this evidence, we are satisfied that the payments were made no later than December 26th. If the district court is correct that TMM/Lykes did not have actual notice of the lien provision in the charter party until January 10th, it correctly held that BBC could not assert a lien against the cargo.

BBC argues that TMM/Lykes had constructive notice of the lien based on the company's knowledge that the Sealand would be the carrying vessel and because Cosvogiannis asked CP Ships to confirm payment to BBC in writing. These arguments fail because none of these facts constitute actual notice of the lien provision. Even if these facts constitute constructive notice, constructive notice is insufficient to perfect liens against third party cargo owners. Finora, 54 F.3d at 212.

BBC's alternative argument is that the lien provision in the Argonaut/Pegasus bill of lading provided actual notice of the charter party lien to TMM/Lykes. The Argonaut/Pegasus bills of lading contains a provision that the "Carrier" shall have a lien on "all goods, which survived delivery for all freight, demurrage . . . and other charges due under this contract." It also defines "Carrier" as "Pegasus Marine Finance, Inc. and any connecting Carrier

7

performing transportation under the transportation agreement evidenced by this bill of lading." The Sealand was identified as the vessel on the face of the bills of lading. BBC's argues that these provisions in the bill of lading coupled with TMM/Lykes' knowledge that the Sealand was the vessel which would be carrying their cargo constitute actual notice to TMM/Lykes of the lien provision in the charter party in favor of BBC. We disagree.

We have found no cases supporting an argument that such incomplete information places the cargo owner on notice of the lien provision in the charter party. The cases finding notice generally do so when the cargo owner is notified that the vessel owner is claiming a lien, the legal basis for the lien (the charter party agreement) and that the vessel owner intends to enforce it by demanding payment of freights directly to it. For example in Hornbeck at 437-38, the vessel owner's agent notified the cargo owner that it claimed a lien under the terms of the charter party and requested that the cargo owner pay all outstanding freights owned to the charterer directly to the vessel owner. In Finora, a vessel owner's request to the subcharterer to pay subfreights directly to it was not actual notice of the lien in favor of the vessel owner because it was based on the ground that the charterer had assigned the subfreights. Finora at 211. The court held that the notice "should inform third-party obligors of the existence of the lien, the legal basis for the lien, and the fact that the lienholder intends to exercise it." Finora at 212. Nothing in the Argonaut/Pegasus bill of lading makes reference to a lien in favor of BBC, the legal basis for the lien (the charter party agreement) or that BBC intended to enforce it. Finora, 54 F.3d at 212. The language of this provision does not satisfy the requirement of "clear notice" required to impose a lien for

8

unpaid charter hire on cargo owned by a party not in privity with the vessel owner and charterer. Id. Such notice was not given to TMM/Lykes until January 10, 2002, after TMM/Lykes had paid its freight obligation to Argonaut/Pegasus.

Accordingly, the district court did not err by finding that BBC could not assert a carrier's lien for freight against TMM/Lykes' cargo, *in rem*, either under the general maritime law or pursuant to the lien provision in the charter party with Argonaut/Pegasus.

### III.

BBC argues next that the district court erred in finding that the Sealand ratified and then breached the bills of lading issued by Argonaut/Pegasus, making the Sealand liable *in rem* for transshipment costs incurred by TMM/Lykes.

### A.

BBC argues that the district court erred by concluding that the Sealand was bound by bills of lading issued by Argonaut/Pegasus and liable thereunder for a deviation because the bills of lading were unauthorized and because they were issued after the Sealand sailed with the TMM/Lykes' cargo on board. Neither of those factors affect the Sealand's *in rem* liability for a deviation. The general rule is that -

> When cargo has been stowed on board the vessel and bills of lading are issued, the bills of lading become binding contracts on the vessel *in rem* upon the sailing of the vessel with the cargo. The sailing of the vessel constitutes a ratification of the bills of lading. . . . This action gives rise to a maritime lien which is the basis of the *in rem* recovery. Even though the vessel is operating under charter parties, the lien against the vessel is not affected.

Cactus Pipe & Supply Co. v. M/V Montmartre, 756 F.2d 1103, 1113 (5th Cir. 1985)(citations

9

omitted). The bills of lading issued in <u>Cactus Pipe</u> by the charterer may have been authorized by the master of the vessel. <u>Id.</u> at 1106, n.1. However, even if bills of lading are issued without the master's authority, as in this case, the same principle applies.

> Moreover, if bills of lading are not signed by the master or with his authority, but by the charterer, the sailing of the vessel with the cargo on board, and even the receipt of the cargo on board, binds her *in rem* on the bills of lading as the sailing, as well as the receipt of the cargo on board, is held to be ratification of the bill of lading contracts.

2A <u>Benedict on Admiralty</u> §35, citing <u>The Muskegon</u>, 10 F.2d 817 (S.D.N.Y. 1924)("If the voyage is begun, the vessel must carry the goods to destination on the terms agreed by the shipper with the charterer; for when the vessel starts upon the voyage, by implication, there is a ratification and adoption by the ship of the charterer's contract with the shipper.") It is presumed that the master knows that the charterer will issue bills of lading for the cargo loaded thus binding the vessel and cargo together. <u>Id.</u> Accordingly, the fact that the bills of lading issued by the charterer Argonaut/Pegasus were unauthorized by the vessel is irrelevant. <u>Id.</u>

BBC's reliance on <u>Insurance Co. of North America v. S/S American Argosy</u>, 732 F.2d 299 (2d Cir. 1984), a case from the Second Circuit, is misplaced. That case holds that the doctrine of ratification of a bill of lading does not apply to a bill of lading issued by a "nonvessel operating common carrier" (N.V.O.C.C.) without the knowledge or consent of the owner, charterer or master of the vessel.[3] In this case, the bill of lading was not issued

---

[3] A N.V.O.C.C. is a middleman who arranges for relatively small shipments to be picked up from shippers, consolidated and shipped via a carrier or several carriers. <u>Argosy</u>, 732 F.2d at 301.

by a N.V.O.C.C., but by Argonaut/Pegasus, the charterer. In a ruling which no one appeals, the district court found that "Argonaut, Pegasus, and Pegasus Marine S.A. are the same company." Accordingly, a bill of lading issued by Pegasus was issued by and with the knowledge of the charterer, Argonaut, making this case distinguishable from the Argosy decision.

This leaves only BBC's contention that ratification can only occur if the bills of lading are issued before the ship sails. According to 2A Benedict on Admiralty § 34, "the common carrier's liability starts upon accepting delivery of cargo for carriage" and "it is clear that if the vessel sails before the bill of lading has been issued, the instrument which is eventually issued is the contract covering the venture from the start."

Based on the above, the district court did not err by binding the Sealand to the terms of the bills of lading issued by Argonaut/Pegasus. A contract of carriage was created by the acceptance of the cargo on board the Sealand for transport and the terms of the bill of lading, even if not authorized by the vessel, set the terms of the agreement.

B.

BBC argues next that assuming a valid contract was formed when the Sealand ratified the bills of lading, the district court erred in finding that the Sealand breached the contract by failing to discharge cargo in Puerto Cabello. The district court, in its Second Amended Final Judgment, found that when the Sealand did not discharge TMM/Lykes cargo in

Venezuela as required by the bills of lading, but instead discharged the cargo in Houston, Texas, this constituted a deviation and a breach of contract for which the vessel is liable for the costs incurred by TMM/Lykes to ship the cargo from Houston to its correct destination, Puerto Cabello. We agree.

Deviation "has come to mean any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased, such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, *failure to deliver the goods at the port named in the bill of lading* and carrying them farther to another port, or bringing them back to the port of original shipment and reshipping them." C.A. Articulos Nacionales de Goma Gomaven v. M/V Aragua, 756 F.2d 1156, 1158 (5th Cir. 1985)(emphasis added). By carrying TMM/Lykes' cargo that was bound for Venezuela to Houston, the Sealand deviated. Only an "unreasonable" deviation has any affect on the liability of the vessel. This court has found "a shipper can make out a case of unreasonable deviation simply by proving that his cargo was offloaded at a place other than the stipulated destination." Spartus Corp. v. The S/S Yafo, 590 F.2d 1310, 1314 (5th Cir. 1979).[4]

BBC argues that its performance was excused by commercial impracticability because

---

[4] In its reply brief, BBC argues that in order to make a finding of deviation, the district court would also have to make a determination of whether the deviation was reasonable or unreasonable, which it failed to do. Because this argument was not raised until BBC's reply brief, we decline to consider it. Baris v. Sulpicio Lines, 932 F.2d 1540, 1546 n. 9 (5th Cir.) ("Customarily we decline even to consider arguments raised for the first time in a reply brief."), cert. denied 112 S. Ct. 430, 116 L. Ed. 2d 449 (1991).

12

of the failure of Argonaut/Pegasus to provide a berth, stevedores and pay freight as required in the "free in and out" provision in the charter party. We disagree. The "free in and out" provision "simply means that the vessel does not pay for the costs of loading, stowage or discharge. Nitram, Inc. v. Cretan Life, 599 F.2d 1359, 1369 n. 18 (5th Cir. 1979). Those duties were allocated to Argonaut/Pegasus under the charter party. However, any breach by Argonaut/Pegasus of terms of the charter party, to which TMM/Lykes was not a party, can not serve as a basis of relieving BBC's or the Sealand's obligations under the separate contract with TMM/Lykes created by the Sealand's ratification of the bills of lading. Second, failure of Argonaut/Pegasus to provide a berth, stevedores or pay freight would not appear to constitute commercial impracticability. Allocating those duties to Argonaut/Pegasus does not make BBC's duty to discharge cargo at the designated port "possible only at excessive or unreasonable cost" or "alter[] the essential nature of the charter party agreement" as would constitute commercial impracticability. Asphalt International, Inc. v. Enterprise Shipping Corp., 667 F.2d 261, 266 (2d Cir. 1981). Accordingly, BBC or the Sealand's breach of their agreement with TMM/Lykes cannot be excused on this basis.

The district court did not err in finding that the Sealand breached the contract of carriage by failing to discharge cargo in Puerto Cabello or in holding the Sealand liable *in rem* for the transshipment costs incurred as a result of the breach.

IV.

BBC argues next that TMM/Lykes can only recover that portion of its claim of

13

damages that is supported by documentary proof. It concedes that $43,886 in damages are supported by documentary evidence. This contention is without merit. The remainder of the expenses were established by the deposition testimony of a TMM/Lykes corporate representative whom BBC had the opportunity to cross examine. His testimony itemized the costs incurred by TMM/Lykes to transship the cargo to its correct destination. BBC does not challenge any particular item as not allowable and none of the costs making up the total of $124,509 awarded are estimates or speculative in nature. The district court did not err in awarding damages based in part on oral testimony.

V.

BBC argues finally that the district court erred in granting TMM/Lykes' Rule 60 Motions because those motions allowed the plaintiff to improperly relitigate the issue of deviation. Essentially, what BBC is arguing is that by adding a finding of deviation to the second Amended Final Judgment, the district court improperly changed the legal substance of the judgment. This argument misreads the post judgment rulings in this case.

In its original Memorandum and Order, the district court denied TMM/Lykes' *in rem* and *in personam* claims against BBC and the Sealand because it concluded that "TMM/Lykes' deviation claim arises from its status as a third party beneficiary of the Argonaut-BBC charter agreement" rather than from the contract of carriage it found between TMM/Lykes and the Sealand. The district court also found that "TMM/Lykes' breach of contract claim fails because there is no privity of contract between BBC and TMM/Lykes, and because there was no physical damage to the cargo."

14

TMM/Lykes filed a Rule 59(e) Motion to Alter or Amend the Judgment. TMM/Lykes' position in the motion was that because the district court found in its original judgment that the Sealand ratified the bills of lading issued by Argonaut/Pegasus and was liable, *in rem*, for any loss or damages to the cargo, it should have also provided for recovery against the Sealand for the deviation. It challenged the findings that TMM/Lykes' deviation claim was dependent upon the Argonaut/BBC charter agreement as opposed to the contract of carriage between TMM/Lykes and the Sealand based on the ratified bills of lading. It also argued that the Sealand had unreasonably deviated from the contract by refusing to discharge cargo in Venezuela. Finally, the motion argued that the court erred in concluding that no maritime lien arises for a breach of contract of carriage when there is no physical damage or loss to the cargo.

On November 14, the district court granted TMM/Lykes' motion. The district court revised the challenged finding by deleting references to the TMM/Lykes' deviation claim being dependent on the charter and, significantly, revised one finding to read "TMM/Lykes's breach of contract claim against the *in rem* defendant is established. The Plaintiffs sustained $124, 509.04 in damages proximately caused by the breach and may recover against the *in rem* defendant." (These damages are TMM/Lykes' transshipment cost to ship the Venezuela cargo from Houston.) It repeated its prior findings that the arbitration panel had found that Argonaut/Pegasus breached the charter, and BBC did not. A revised final judgment was not issued.

In December, BBC filed a Motion for Reconsideration or to Alter or Amend the

15

Judgment. BBC argued that the Sealand should not be liable *in rem* because the failure to discharge in Venezuela was not the fault of the vessel, that TMM/Lykes failed to supports its damages and that if the Sealand is liable to TMM/Lykes, BBC should be indemnified by Argonaut/Cosvogiannis. At the same time, TMM/Lykes filed a Motion to Correct Clerical Error or Alternatively for Relief from Judgment under Rule 60. TMM/Lykes argued that the Final Judgment did not accurately reflect the amended findings because it did not allow for *in rem* recovery against the Sealand for the deviation based on the breach of the contract of carriage evidenced by the bills of lading. The district court issued an Amended Final Judgment that allowed TMM/Lykes to recover from BBC but again did not reflect the *in rem* liability against the Sealand. BBC's Motion was denied.

TMM/Lykes filed a second Rule 60 Motion seeking to have the *in rem* liability of the Sealand added to the judgment. The district court granted the motion and issued a Second Amended Final Judgment. This judgment reflected that TMM/Lykes could recover $124,509 against Argonaut / Pegasus / Cosvogiannis and/or the Sealand. It also included the following, "The BBC Sealand did not discharge the TMM/Lykes cargo in Venezuela as required in the bills of lading but instead discharged the cargo in Houston, Texas. This constituted a deviation for which the vessel is liable for the transshipment costs in the amount of $124,509 incurred by TMM/Lykes."

BBC argues that this final amended judgment erroneously permitted a substantive change to the original judgment to be effected through Rule 60. We disagree. The district court's grant of TMM/Lykes' Rule 59 Motion and its revised finding that "TMM/Lykes's

16

breach of contract claim against the *in rem* defendant is established" necessarily incorporated a conclusion that the Sealand committed deviation.  Deviation is the only possible source of breach identified by any of the parties.  The final change in the judgment was a clerical one that was necessary to harmonize the judgment to the court's ruling on TMM/Lykes' Rule 59 Motion.

VI.

In summary, BBC chartered its vessel the Sealand to Argonaut/Pegasus which never paid its charter hire owed to BBC.  Argonaut/Pegasus arranged with TMM/Lykes for carriage of its cargo on the Sealand.  TMM/Lykes paid its freight due to Argonaut/Pegasus.   BBC attempted self help by refusing to discharge TMM/Lykes' Venezuela bound cargo and by claiming a lien on the cargo once the vessel reached Houston, Texas.  However, BBC/Sealand's acceptance of and sailing with TMM/Lykes' cargo in conjunction with the issuance of bills of lading by its charterer Argonaut/Pegasus created a contract of carriage between the Sealand and TMM/Lykes which was breached when the vessel failed to discharge cargo at its proper destination.  BBC/Sealand could have protected itself from nonpayment of charter hire in several ways.  It could have refused cargo in Itajai until its charter hire was paid as set forth in the charter party or it could have perfected its lien against the cargo by giving TMM/Lykes actual notice of the lien provision in the charter party before TMM/Lykes paid its freight to the charterer Argonaut/Pegasus.  Argonaut/Pegasus is the wrongdoer in this transaction.  But as between BBC and the Sealand and TMM/Lykes, BBC and its vessel the Sealand were in the best position to protect themselves against

17

nonpayment.  They failed to do so and the district court's judgment in favor of TMM/Lykes is affirmed.

AFFIRMED.